The **ALEUT LEAGUE**, on behalf of itself, its members and all those similarly situated, Plaintiffs,

v.

The **ATOMIC ENERGY COMMISSION** et al., Defendants.

Civ. No. A–127–71.

United States District Court, D. Alaska.

Oct. 8, 1971.

Hugh W. Fleisher, Alaska Legal Services Corp., Anchorage, Alaska, for plaintiffs.

G. Kent Edwards, U. S. Atty., Anchorage, Alaska, Thomas L. McKevitt, Atty., Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OF DECISION AND ORDER

PLUMMER, Chief Judge.

On September 2, 1971, plaintiffs commenced this action specifically to prevent the detonation of a nuclear device termed CANNIKIN on Amchitka Island. Plaintiffs' motion for a preliminary injunction was filed on September 13, 1971, and defendants' motion for summary judgment or alternatively, dismissal, was filed on September 21, 1971. Hearings were held on both motions on September 27 and 28.

On October 8, the court denied plaintiffs' motion for a preliminary injunction, reserved judgment on defendants' motion for summary judgment or dismissal, and ordered a full hearing on the merits to commence on October 13. A stipulation was filed October 12, wherein the parties agreed that the hearing held September 27 and 28 would be considered by both sides to be a full hearing on the merits and that the standing of plaintiffs to sue in this action and their position as proper parties would not be contested by defendants.

Thereafter, a brief was filed by defendants on October 22 and by plaintiffs on October 25.

## JURISDICTION

Federal courts have special and limited jurisdiction, so the threshold inquiry in each case must be directed toward a determination of whether the court has power to entertain and decide the matter in controversy in the proceeding before it. United States District Courts have no jurisdiction except that conferred by the Constitution and laws of the United States and the presumption is, that the case is without their jurisdiction, unless the contrary affirmatively appears.

The party asserting jurisdiction has the burden of proof, and, if his allegations of jurisdictional fact are challenged in an appropriate manner, he must support them by competent proof.

Jurisdiction cannot be conferred by consent, waiver or conduct of the parties, and if the question is not otherwise suggested, the court must in every case on its own motion determine whether it has jurisdiction.

Paragraph 2 of plaintiffs' complaint alleges that jurisdiction is conferred upon this court by: 5 U.S.C. §§ 701–706 (Administrative Procedure Act); 28

U.S.C. § 1331 (Federal Question); 28 U.S.C. § 1343 (Civil Rights); 28 U.S.C. § 1353 (Indian Allotments); 28 U.S.C. § 1361 (Mandamus); and 43 U.S.C. § 1332 (Federal Control over the Outer Continental Shelf).

■ The statutes alleged by plaintiff, with the exception of 43 U.S.C. § 1332 (Federal Control over the Outer Continental Shelf), are ones which would empower the court to act if plaintiff has proved facts bringing it within their purview. 43 U.S.C. § 1332 is a declaration of the policy, jurisdiction and construction of the United States with reference to the subsoil and sea bed of the Outer Continental Shelf. It is not a statute conferring jurisdiction on the United States District Courts.

Paragraph 3 of plaintiffs' complaint alleges that this action arises under: The Fifth Amendment to the Constitution of the United States (Due Process, Equal Protection); 25 U.S.C. §§ 2, 9 and 43 U.S.C. § 1457(10) (Fiduciary Obligations owed to Indians); 33 U.S.C. §§ 1151, 1162 (Control of Water Pollution by Hazardous Substances); 42 U.S.C. § 2011 et seq. (Atomic Energy); 42 U.S.C. §§ 4331–4332 (National Environmental Policy Act); 48 U.S.C. § 357, as amended (Alaska Native Allotments); and that the matter in controversy herein exceeds $10,000 exclusive of interest and costs.

The Fifth Amendment to the Constitution of the United States in pertinent part provides in substance that no person shall be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without a just compensation.

■ Plaintiff asserts that defendants' preparation and planned execution of the CANNIKIN nuclear experiment amounts to a violation of its Fifth Amendment right to due process and guarantee against the taking of private property without just compensation. There is no evidence that plaintiff is the owner of any personal or real property. The major portion of the Aleutian Islands is a national wildlife refuge. There is some private ownership of real property by members of plaintiff's league in Unalaska and a few other places. There are references to ownership of fishing boats, air planes, fishing and hunting rights and claims of aboriginal title. Plaintiff has not proved that it or any of its members have any vested interest in hunting rights, fishing rights or aboriginal title to any land. See Tlingit and Haida Indians of Alaska v. United States, 389 F.2d 778, 182 Ct. Cl. 130 (1968). The evidence does not establish that plaintiff or any of its members have been or will be deprived of life, liberty or property, without due process of law or that any private property has been or will be taken for public use, without just compensation.

■ The Fifth Amendment contains no equal protection clause and restrains only such discriminatory legislation by Congress as amounts to a denial of due process. Due process of law and the equivalent phrase "law of the land" have frequently been defined to mean a general and public law operating equally on all persons in like circumstances, and not a partial or private law affecting the rights of particular individuals or class of individuals in a way in which the same rights of other persons are not affected. Plaintiffs assert that in view of the fact that the Aleutian Islands on which the proposed detonation will occur are populated principally by Aleut people, minority people, that the United States has not taken proper cognizance of the interests of these people and the action of the proposed detonation therein and of itself constitutes discrimination against them as opposed to other persons in the United States of America. Plaintiff also asserts that the location of this test on Amchitka Island in the Aleutians is discriminatory against the Aleut people and does constitute possible serious harm to their lives, property and culture, while the AEC has recognized the rights of other persons, specifically, those who

live in other zones that might be affected by a nuclear detonation if it were detonated in some other part of this country or elsewhere.

■ Courts may take judicial notice of the federal census or of an official census taken under the state laws, such as a school census, and of the results of such censuses, and can resort for information to appropriate documents of reference. The 1970 Census of Population, PC (V1)–3, Alaska, Advance Report, December 1970, pages 6–9, reflects the following:

| Location | Population |
| --- | --- |
| Shemya | 1131 |
| Adak | 2249 |
| Atka | 88 |
| Nikolski | 57 |
| Unalaska | 178 |
| Akutan | 101 |
| False Pass | 62 |
| Pavlov Harbor | 39 |
| Cold Bay | 256 |
| King Cove | 283 |
| Belkofski | 59 |
| Sand Point | 360 |
| Squaw Harbor | 65 |
| Ivanov Bay | 48 |
| Perryville | 94 |
| Chignik | 83 |
| Chignik Lake | 117 |
| St. Paul | 450 |
| St. George | 163 |
| Nelson Lagoon | 43 |

The above information also appears in 1970 Census of Population, Number of Inhabitants, Alaska, PC(1)–A3, Issued May 1971, pages 3–10.

The 1970 Census of Poulation & Housing, Final Report, April 1971, PHC(2)–3 Alaska, pages 3–7, provides the following information:

| Aleutian Islands | | |
| --- | --- | --- |
| | 5564 | White |
| | 237 | Negro |
| | 2256 | All others |
| | 8057 | |

■ Judicial notice may be taken of the relative distances from certain places to other parts of the same state. In this manner or by use of a map with a scale showing the number of miles per inch, the approximate distances between the villages lying easterly of Amchitka Island may be ascertained. The court has determined these distances to be approximately as follows:

| From | To | Approx. Miles |
| --- | --- | --- |
| Amchitka | Adak | 200 |
| " | Atka | 300 |
| " | Nikolski | 550 |
| " | Unalaska | 650 |
| " | Akutan | 700 |
| " | False Pass | 900 |
| " | Pavlov Harbor | |
| " | Cold Bay | 930 |
| " | King Cove | |
| " | Belkofski | 960 |
| " | Sand Point | 1030 |
| " | Squaw Harbor | |
| " | Ivanov Bay | |
| " | Perryville | 1210 |
| " | Chignik | 1260 |

Plaintiff's Exhibit 32 reflects that the distance from Amchitka to Shemya, which is located westerly of Amchitka, is 250 miles. There are no Aleuts residing on Amchitka Island and there are no Aleut villages on the Aleutian Chain westerly of Amchitka.

■ From the foregoing, it is readily apparent that there are 3,380 persons residing at Shemya and Adak that are nearer to Amchitka than the 88 persons who reside at Atka, the Aleut village located nearest to Amchitka, and that there are 5,795 non-Aleuts as compared to a possible 2,256 Aleuts that live on the Aleutian Islands. There is no evidence that the 2,256 Aleuts have been or will receive protection or treatment different in any degree or respect than that which has been or will be afforded the 5,795 non-Aleuts residing in the area. Plaintiff's assertion of discrimination and lack of equal protection as to the Aleut people has no factual basis.

■ 25 U.S.C. § 2 provides that the Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations.

25 U.S.C. § 9 provides that the President may prescribe such regulations as he may think fit for carrying into effect the various provisions of any Act re-

lating to Indian affairs and for the settlement of the accounts of Indian affairs.

43 U.S.C. § 1457 provides that the Secretary of the Interior is charged with the supervision of public business relating to certain following subjects and agencies therein stated included in which is the subject of Indians.

These statutes are totally unrelated to any rights, duties or responsibilities between plaintiff and the defendants in this case.

33 U.S.C. § 1151 pertains to the Congressional declaration of policy in controlling water pollution and the right of States to waters.

33 U.S.C. § 1162 relates to the control of pollution by hazardous substances, and authorizes the President to promulgate rules and regulations designating hazardous substances and to recommend methods and means for the removal of such substances.

These statutes are unrelated to the defendants and the proof in this case.

48 U.S.C. § 357, as amended August 2, 1956, c. 891, § 1(a)–(d), 70 Stat. 954, 43 U.S.C. § 270–1, authorizes the making of homestead allotments to native Indians, Aleuts, or Eskimos.

28 U.S.C.A. § 1353, provides that the District Courts shall have original jurisdiction of any civil action involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any Act of Congress or treaty. The complaint demonstrates that it does not seek relief on behalf of plaintiff or its members as persons who have been excluded from an allotment or have been excluded from or are entitled to possession of a parcel of land. The statutes cited by plaintiff are obviously intended to provide relief to Aleuts entitled to possession of allotments and similar interests. The cases and statutory law have ascribed to the word "allotment" a well recognized meaning. The nature of the interest asserted by plaintiff does not resemble that described in the statutes. *See* Affiliated Ute Citi-

zens of State of Utah v. United States, 431 F.2d 1349 (10th Cir. 1970).

28 U.S.C. § 1331 provides in part that District Courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States. A federal question is presented only where the correct decision in a case depends upon the construction or interpretation of the Constitution, treaties or laws of the United States, or on the validity of a statute or treaty. Otherwise stated, to bring a case within a statute, a right or immunity created by the Constitution, treaties or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. The right or immunity must be such that it will be supported if the Constitution, treaties or laws of the United States are given one construction or interpretation, and defeated if they receive another. It is doubtful on the pleadings in this case whether there is any dispute between the parties as to the meaning of any provision of the Constitution or the laws or treaties of the United States. This is essential to federal question jurisdiction.

Paragraph 1 of plaintiff's complaint alleges that this action was brought specifically to prevent the detonation of a nuclear device termed CANNIKIN on Amchitka Island, Alaska, in accordance with the rights, title and interest of the plaintiffs. All other Constitutional questions sought to be raised are incidental to this purpose. Under these circumstances the case cannot be said to "arise" under the Constitution, laws or treaties of the United States. The fact that it may be necessary in the course of litigation to construe or apply provisions of the Constitution, laws or treaties of the United States is not sufficient to give application to 28 U.S.C. § 1331. *See* Pierre v. Jordan, 333 F.2d 951 (9th Cir. 1964); *Walker v. Bank of America*, 268 F.2d 16 (9th Cir.

**540**

1959); Beistline v. City of San Diego, 256 F.2d 421 (9th Cir. 1958); Marshall v. Desert Properties Co., 103 F.2d 551 (9th Cir. 1939).

■ Plaintiff asserts jurisdiction under 28 U.S.C. § 1343 dealing with civil rights and elective franchise. However, no claim under the Civil Rights Act has been alleged or proved by plaintiff. *See* Hoffman v. Halden, 268 F.2d 280 (9th Cir. 1959).

■ This action was brought specifically to prevent the detonation of CANNIKIN on Amchitka Island. The Civil Rights Act contemplates that the prime objective of suits brought thereunder is to redress the deprivation of any right, privilege or immunity secured by the Constitution and laws of the United States. Where there is some other principal objective of the litigation, and the deprivation of Constitutional rights is asserted only as a means of achieving that objective, the subject matter is not cognizable under the Civil Rights Act, and District Court jurisdiction thereunder is lacking. *See* Pierre v. Jordan, *supra*.

28 U.S.C. § 1361 provides that the District Court shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff. Again, plaintiff fails to relate this assertion of judisdiction to the facts and proof in the case.

■ Mandamus is an extraordinary remedial device that may issue only when the claim for relief is clear and certain, and the duty of the officer involved is ministerial, plainly defined, and pre-emptory. Plaintiff has not alleged or proved facts that would justify the granting of mandamus and the court is without jurisdiction under 28 U.S.C. § 1361.

In the memorandum of decision and order entered in this case on October 8, 1971, the court stated: "Accordingly, there is little information before the court as to the membership of the Aleut League, the class it purportedly repre-

sents, the location of the various members of the class from Amchitka Island, whether they have been notified and consented to this action and their being represented by plaintiff. The lack of this and other information makes it at least questionable as to who the proper parties are."

The court then and now has insuffficient information to enable it to make a reasoned determination as to whether 1) a class exists, 2) the class is so numerous that joinder of all members is impracticable, 3) whether there are questions of law or fact common to the class, 4) whether the claims or defenses of the representative parties are typical of the claims or defenses of the class, 5) whether the representative parties will fairly and adequately protect the interests of the class, and 6) whether the party or parties opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

In plaintiff's post-hearing brief, it asserts that the Administrative Procedure Act requires that, in making the determinations necessary under the Act the "whole record" be reviewed. However, 5 U.S.C. § 706 provides in part that in making the determinations enumerated therein, the court shall review the whole record *or those parts of it cited by a party*. (Italics supplied.)

Plaintiff further asserts that although it is AEC's responsibility to obtain and set forth the opposing scientific views, citing 42 U.S.C. § 4332, and, otherwise to file the whole record or at least that portion of the Administrative record which directly pertains to the proposal to detonate CANNIKIN, all elements of the record which have been filed to date are conclusions supporting the AEC decision. 42 U.S.C. § 4332 requires only that "prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to

any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality, and to the public, as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;" AEC has strictly complied with this requirement of the law.

Plaintiff further suggests that on the basis of press reports, the recent decision in The Committee for Nuclear Responsibility, Inc. v. Seaborg, No. 71–1732 (D.C. Cir. October 5, 1971); and Mink v. Environmental Protection Agency, No. 71–1708 (D.C.Cir. October 15, 1971), the court should enter an immediate order requiring the defendants to file the remaining portions of the record before the AEC, including those documents in issue in the *Mink* suit, which can be inspected *in camera*, and any and all other studies or reports of other Federal agencies relating to CANNIKIN.

In case No. 71–1732, *supra*, plaintiff commenced discovery proceedings in an attempt to establish the deficiency of the Environmental Impact Statement's treatment of potential dangers of the test. They were precluded from accomplishing this by the entry of summary judgment in favor of the defendant.

In case No. 71–1708, *supra*, suit was brought by 33 members of Congress under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, to obtain several documents pertaining to CANNIKIN. The district court declined to compel disclosure of the requested documents on the ground that they were exempted by the express provisions of FOIA. The circuit court directed that the documents be produced for *in camera* inspection by the district court and for such further proceedings as might then be indicated.

In the case before this court, the record does not reflect that plaintiff has initiated any discovery procedures. The record does not indicate that plaintiff

has at any time requested and been refused documents available under the provisions of 5 U.S.C. § 552. Subsection (a) (3) of that Act provides:

"(3) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, each agency, on request for identifiable records made in accordance with published rules stating the time, place, fees to the extent authorized by statute, and procedure to be followed, shall make the records promptly available to any person. On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo and the burden is on the agency to sustain its action. In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member. Except as to causes the court considers of greater importance, proceedings before the district court, as authorized by this paragraph, take precedence on the docket over all other causes and shall be assigned for hearing and trial at the earliest practicable date and expedited in every way."

 Unless plaintiff takes steps to comply with the requirements of the foregoing Act, the court is without jurisdiction to consider the suggestions contained in its post-trial brief.

5 U.S.C. § 702 provides that a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

42 U.S.C. § 2231 provides in pertinent part that the provisions of the Adminis-

trative Procedure Act shall apply to all agency action taken under this chapter, and the terms "agency" and "agency action" shall have the meaning specified in the Administrative Procedure Act.

In Ely v. Velde, 321 F.Supp. 1088 (D. Va.1971), the court held that the National Environmental Policy Act, 42 U.S.C. § 4321, 4331 et seq., were relevant statutes within the meaning of 5 U.S.C. § 702 and that the plaintiff's interest came within those sought to be protected by the Act.[1]

The court having considered the testimony of the witnesses called by the respective parties all documents and exhibits admitted in evidence, the briefs and arguments of counsel, and being fully advised in the premises, now makes and enters the following:

## FINDINGS OF FACT

1. The National Environmental Policy Act is a relevant statute within the meaning of the Administrative Procedure Act.

2. The agency action to be reviewed by the court under 5 U.S.C.A. § 706(2) and 42 U.S.C.A. § 2231, is the decision by the AEC to conduct the detonation of the underground nuclear explosion codenamed CANNIKIN on Amchitka Island, Alaska.

3. Executive Order 1733, issued by President Taft in 1913, which designated that part of the Aleutian Chain which includes Amchitka as a wildlife preserve, specifically provided that "The establishment of this reservation shall not interfere with the use of the Islands for . . . military . . . purposes."

4. The Atomic Energy Commission, hereinafter referred to as AEC, is an agency of the United States Government, created by Act of Congress, 60 Stat. 756, 42 U.S.C. § 2031, and is authorized by laws of the United States to conduct tests of and research into nuclear weapons.

5. 42 U.S.C.A. § 2121 entitled "Authority of Commission—Research and development; production of atomic weapons", provides:

"(a) The Commission is authorized to—

(1) conduct experiments and do research and development work in the military application of atomic energy; and

(2) engage in the production of atomic weapons, or atomic weapon parts, except that such activities shall be carried on only to the extent that the express consent and direction of the President of the United States has been obtained, which consent and direction shall be obtained at least once each year."

6. On August 5, 1963, representatives of the United States, United Kingdom, and Union of Soviet Socialist Republics, signed a treaty prohibiting nuclear explosive tests in the atmosphere, outer space and under water, but permitted certain underground nuclear explosions. The United States Senate gave its advice and consent to the ratification of the Limited Test Ban Treaty on September 24, 1963.

7. Since 1963, the AEC has maintained an active underground nuclear testing program in southern Nevada. The primary purpose of the program is to test and evaluate nuclear weapons

1. The court notes the possibility that a different result might be reached on the record in the present case where, 1) the decision to use Amchitka Island as a site for high yield nuclear experiments and tests was requested by AEC and approved by the President in December of 1966 and preparations and planning for the CANNIKIN test were commenced in 1966, more than three years prior to January 1, 1970, the effective date

of NEPA, and thereafter continued to the present date, and 2) the proof before the court establishes the CANNIKIN test will not significantly affect the quality of the human environment. See Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238 (D.Pa. 1970); Investment Syndicates, Inc. v. Richmond, 318 F.Supp. 1038 (D.Ore. 1970); Brooks v. Volpe, 319 F.Supp. 90 (D.Wash.1970).

concepts as needed to meet the requirements of national security.

8. In October of 1965, Long Shot, a Department of Defense—sponsored underground nuclear test was carried out at Amchitka. Bioenvironmental surveys were done.

9. In June 1966, the Department of Defense requested the AEC to develop a warhead for a proposed antiballistic missile system.

10. In 1966, it appeared that the Department of Defense would soon ask the AEC to design a nuclear explosive of yields larger than could be safely tested at the existing Nevada test site, the limitations there being the ground motion and its effect on high-rise buildings in Las Vegas. The AEC's Nevada operations office and its contractors in the weapons laboratory (Los Alamos Scientific Laboratory, Lawrence Radiation Laboratory, and Sandia Laboratories,) began to look for supplemental test sites. The basic criteria were that the sites have geology proper for the proposed tests and for containment of resulting radioactivity and that the sites be sufficiently remote to give reasonable assurance of safety.

11. For this reason, the AEC caused an extensive search to be conducted for a suitable site for high yield tests. Sites at Red Desert, Wyoming; Desert Valley, Nevada; San Augustine Plains, New Mexico; Kaiparowits Plateau, Utah; Fortification Range, Nevada; Steens Mountain, Oregon; Hualapai Mountains, Arizona; Paradox Base, Utah-Colorado; White Sands, New Mexico; Davis Mountains Texas; North Brooks Range, Alaska; Hawaiian Islands; Black Rock Desert, Nevada; Yuma-Tule Area, Arizona; San Juan Basin, New Mexico; Hyco Range, Nevada; Pancake Range, Nevada; Panamint Valley, California; Oyhee County, Idaho; Jenez Mountains, New Mexico; Delaware Basin, New Mexico; Amchitka, Alaska; Christmas Island (British); and Western Australia, were seriously studied and considered by AEC.

12. The sites recommended and the problems related thereto were:

| Amchitka | Uncertain geology, ecology, weather, cost |
| Central Nevada | Ground water, ground shock (Yield limitation) |
| North Brooks Range | Uncertain geology, caribou-lichen, time, cost |
| Christmas Island | Foreign |
| Western Australia | Foreign |

13. Of the locations considered, it was found that the island of Amchitka best satisfied the requirements for the tests involved. It is not a large island, and is remote, situated about 1400 miles southwesterly along the Aleutian Chain from Anchorage. While there are small populated areas closer to Amchitka, in no instance are they so close that the nuclear test being planned would endanger people or create a hazard to structures. Amchitka Island is also accessible by sea and air at all times of the year.

14. The geologic properties of Amchitka Island were proper for deep hole drilling and containment of the underground experiments, and finally, both the cost of conducting tests at Amchitka and the time required to prepare and execute those tests would be much less than would be required for operations in the more remote northern slopes of the Brooks Range in Alaska. While the Amchitka climate is generally unpleasant, it is not severe. On the other hand, the climate at an alternative site on the northern Brooks Range is so extreme that necessary operations would have been exceedingly difficult and slow.

15. Before seeking Presidential approval to use Amchitka Island for the conduct of high yield tests, the AEC consulted various interested federal departments and agencies, including the Department of the Interior. Presidential authorization to proceed with an initial survey of Amchitka Island as a possible supplemental test site was received in August 1966. Planning for operations at Amchitka was also coordinated with the

State of Alaska, initially in 1966, and subsequently as plans were developed.

16. After the completion and review of the 1966 study and survey, and after consulting with the Secretary of the Interior, AEC requested permission to use Amchitka Island to conduct the tests necessary to develop the Department of Defense proposed warhead. This authority from the President was received in December 1966.

17. Although preparations for the CANNIKIN test began in 1966, more than three years prior to January 1, 1970, the effective date of the National Environmental Act of 1969, environmental matters and factors were of major importance during the consideration of all phases in the planning and preparations for the contemplated test.

18. By January of 1967, work had commenced and people and equipment began arriving in Amchitka. Actual drilling work started by March 1967, even though the camps, roads and facilities were not then fully completed.

19. As a part of its preparation for the CANNIKIN test, the AEC conducted a calibration test of about one megaton, code-named MILROW, on October 2, 1969, to collect data concerning the physical and biological effects of a high yield underground explosion upon the Amchitka environment, and to provide an experimental basis for prediction of CANNIKIN effects to supplement the theoretical predictions. The results of the MILROW test coincided closely with the predictions, and provided valuable information and evidence that the CANNIKIN test can be fired safely and without important impact on the environment.

20. CANNIKIN is the code-name used to designate a nuclear test or experiment planned to be conducted on Amchitka Island, Alaska in the fall of 1971. CANNIKIN entails the site preparation, detonation and monitoring of an explosive device approximately 6,000 feet beneath the surface of the island. CANNIKIN is the culmination of approximately four or five years of intensive preparation and planning by the AEC. The need for the CANNIKIN test is vital to the development of the United States weapons program.

21. The AEC is required under the Atomic Energy Act to take all necessary measures to protect the public health and safety in connection with all United States nuclear detonations. In meeting its responsibilities, it has conducted numerous studies and reviews to enable it reliably to predict the effects of nuclear detonations on the safety of persons and property. A detailed recitation of the deliberately repetitive review process developed by the AEC to insure safety in connection with nuclear operations is set forth in the publication entitled "Nuclear Discussions of Off-Site Safety Programs for Underground Nuclear Detonations" (NVO–40, REV. No. 2, May, 1969), which summarizes the extensive technical studies pertaining to effects of nuclear detonations on public health and safety.

22. Safety studies undertaken specifically in connection with AEC's operations associated with the development of the Spartan warhead were begun as early as 1966, and continued until the present day. These studies were conducted by the AEC with extensive participation from outside the AEC itself. Public hearings on the safety and environmental impact aspects of the CANNIKIN test were held in Juneau, Alaska on May 26, 1971, and in Anchorage, Alaska on May 28–29, 1971. The safety studies, as well as the predictions of the expected effects of the CANNIKIN test, are summarized in the CANNIKIN environmental statement, Defendants' Exhibit No. 2 and Defendants' Exhibit No. 3 through No. 16, all of which are available to the public.

23. The selection of Amchitka as the test site for underground nuclear testing in 1966 and all matters relating to the preparation and development of the site and testing program were widely publicized throughout Alaska, and those matters, as well as the fact that preparations were being made for a higher

yield underground explosion on Amchitka Island, have been matters of common knowledge throughout Alaska, including the Aleutian Islands, for the past several years.

24. Pursuant to Section 102(2) (C) of the National Environmental Policy Act of 1969, the AEC issued a draft environment statement on CANNIKIN on June 17, 1970. This statement was prepared and transmitted in accordance with the interim guidelines of the Council on Environmental Quality and implementing AEC regulations to appropriate federal agencies having jurisdiction by law or special expertise with respect to environmental impact, and to State and local agencies authorized to develop and enforce environmental standards. Notice of public availability of the statement was published in the Federal Register on June 20, 1970. Copies of the draft environment statement on the CANNIKIN test were in 1970 sent to the Governor of the State of Alaska, Senator Mike Gravel, and to the Honorable Carl Moses, president of the Aleut Indian League, and to over 300 individual requesters. All comments received by the AEC on the draft statement were taken into consideration during the preparation of the final environmental statement on the test. Comments submitted to the AEC by federal, State and local agencies were included in the final statement.

25. The final "Environment Statement—CANNIKIN" was submitted to the Council on Environmental Quality on June 23, 1971. Copies of the statement were also sent to all groups and individuals listed in Exhibit 17, among others, including the Joint Committee on Atomic Energy and the Appropriations Committee of both the Senate and House of Representatives. Copies of the transcript of the public hearings referred to in paragraph 22 were also sent to the Joint Committee on Atomic Energy, the Undersecretary's Committee of the National Security Council, and the Council on Environmental Quality, among others.

26. The Environmental Statement CANNIKIN, June 1971, contains a detailed statement of R. E. Hollingsworth, General Manager and responsible official of the United States Atomic Energy Commission, setting forth—

1. the environmental impact of the proposed action,

2. the adverse environmental effects which cannot be avoided should the proposal be implemented,

3. alternatives to the proposed action,

4. the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity,

5. any irreversible and irretrievable commitment of resources which would be involved in the proposed action should it be implemented.

27. AEC has used all practicable means, and to the fullest extent possible, consistent with other essential considerations of national policy, has fully and in good faith complied with the requirements of NEPA and the guidelines issued by the Council on Environmental Quality.

28. The AEC has acted and is acting within the scope of its authority. The final agency action or decision by AEC, now being challenged, was based on a consideration of all relevant factors and in accordance with the necessary procedural requirements. There has been no error of judgment on the part of AEC and its final decision is not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

29. The court finds that the final Environmental Statement CANNIKIN prepared and submitted by the AEC in June 1971, which forms a part of the record in this case, is sufficient in detail, adequate in scope of coverage, and satisfies the requirements of NEPA and the guidelines supplementing that Act issued by the Council on Environmental Quality. That AEC in preparing and planning for the CANNIKIN test, has complied with the provisions of NEPA and all relevant laws and treaties related thereto, and has not acted or threatened to act beyond the scope of its authority or in abuse of its

discretion or to engage in any unauthorized or illegal actions.

From the foregoing facts, the court makes and enters the following:

## CONCLUSIONS OF LAW

1. Plaintiff has failed to prove by a preponderance of the evidence the claims alleged in Counts 1, 3 and 4 of the complaint and the same should be dismissed.

■■■ 2. The court has jurisdiction under 5 U.S.C. § 706(2) and 42 U.S.C. § 2231, to review the final agency action taken by the AEC to conduct the detonation of CANNIKIN on Amchitka Island, and to review the sufficiency of the final Environmental Statement—CANNIKIN, June 1971.

■■■ 3. The AEC has at all times acted and is acting within the scope of its authority. The final agency action or decision by AEC, now being challenged, was based on a consideration of all relevant factors and in accordance with the necessary procedural requirements. There has been no error of judgment on the part of AEC and its final decision is not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

■■■ 4. The court finds that the final Environmental Statement—CANNIKIN, prepared and submitted by the AEC in June 1971, which forms a part of the record in this case, is sufficient in detail, adequate in scope of coverage, and satisfies the requirements of NEPA and the guidelines supplementing that Act issued by the Council on Environmental Quality. The AEC in preparing and planning for the CANNIKIN test, has complied with the provisions of NEPA and all relevant laws and treaties related thereto, and has not acted or threatened to act beyond the scope of its authority or in abuse of its discretion or to engage in any unauthorized or illegal actions.

5. Plaintiff has failed to prove by a preponderance of the evidence the allegations set forth in its second claim, and the same should be dismissed.

Let judgment be entered accordingly.