**A. O. SMITH et al., Plaintiffs,**

**v.**

**FEDERAL TRADE COMMISSION et al.,
Defendants.**

**Civ. A. No. 75–15.**

United States District Court,
D. Delaware.

Sept. 22, 1975.

evant. Fed.Rules Civ.Proc. rule 26, 28 U.S.C.A.; 5 U.S.C.A. § 706(2)(A).

———◆———

Richard F. Corroon, Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, Del., Gilbert J. Helwig, Pittsburgh, Pa., John M. Wood, Lee A. Rau, and Edward T. Tait, of Reed, Smith, Shaw & McClay, Washington, D. C., for plaintiffs.

W. Laird Stabler, U. S. Atty., Wilmington, Del., Robert J. Lewis, Gen. Counsel, Gerald Harwood, Asst. Gen. Counsel, James P. Timony, William A. Cerillo, Bruce G. Freedman, Mary L. Azcuenaga, Warren S. Grimes, F.T.C., Washington, D. C., for defendant F.T.C.

MURRAY M. SCHWARTZ, District Judge.

This case involves pre-enforcement judicial review of the Federal Trade Commission ("Commission" or "FTC") annual line-of-business reporting program.[1] Previously this Court preliminarily enjoined the defendant Commission from enforcing its Orders to File Form LB against the plaintiffs in this action and related litigation.[2] The instant controversy arises over two discovery motions, the Commission's Motion for a Protective Order and the plaintiffs' Motion to Compel.

By its Motion for a Protective Order[3] the FTC seeks to halt the depositions of four Commission officials involved in the development and administration of the LB Program.[4] In support of its motion the defendant Commission contends both that the depositions will be unduly burdensome, resulting in total disruption

1. The Commission, by resolution of August 2, 1974 adopted the Line-of-Business ("LB") Program and subsequently served Orders to File Form LB upon 345 American corporations. Notice of the Commission's August 2, 1974 resolution was published in the Federal Register on August 22, 1974. 39 Federal Register 30377.

2. A. O. Smith Corporation et al., v. Federal Trade Commission, 396 F.Supp. 1108, Civil Action No. 75–15 (D.Del.1975); *Inland Steel*

*Company v. Federal Trade Commission*, 396 F.Supp. 1125 (D.Del.1975).

3. Docket No. 52.

4. Plaintiffs had originally noticed a total of nine depositions of Commission officials. To date five of the nine depositions have been completed and the Commission seeks to prevent the plaintiffs from taking the remaining four depositions.

of the LB Program, and that all discovery in this action is improper. Further, the Commission has sought, in the event its motion is denied, to have the Court certify this question to the Third Circuit Court of Appeals pursuant to 28 U.S.C. § 1292(b).[5] Plaintiffs have responded by asserting the Commission has failed to demonstrate the "good cause" required by Fed.R.Civ.Proc. 26(c) to justify issuance of a protective order. Plaintiffs oppose the FTC request for section 1292(b) certification on the ground that the matter before the Court involves no "controlling question of law."

Plaintiffs' Motion to Compel[6] seeks 209 documents currently in defendants' possession,[7] as well as an order requiring a Commission official to answer 17 questions as to which claims of privilege were interposed during the taking of his deposition. This particular facet of the instant litigation has been especially acrimonious, resulting in a wrestling match[8] between opposing counsel and the Commission-induced disappearance of the Hubler documents during a deposition recess. However, in addition to the physical defenses raised by Commission counsel, several legal issues have been raised by the parties in connection with this motion. The Commission asserts that none of the documents or the

17 questions have any relevance whatsoever to the current suit. Further, the Commission has attempted to raise the executive privilege attaching to intra-agency advisory communications as a bar to discovery with respect to many[9] of the documents and the 17 specific questions. Plaintiffs have countered by arguing that the documents and subject-matter of the deposition questions are indeed relevant, the claim of executive privilege was improperly raised, and even if properly raised, subject to a multitude of specific exceptions. Plaintiffs also contend that any executive privilege claims properly attaching to the deposition questions were waived by the Commission during examination of the Commission official.

The parties' arguments in support and in opposition to the two motions are considered separately below.

## I. SCOPE OF REVIEW

### A. In General

■ The initial inquiry to be undertaken in measuring the propriety of a wide-ranging discovery request is whether the materials sought are relevant to any of the legal and factual issues being contested by the parties.[10] In order to measure this relevance factor in a case involving judicial review of agency ac-

---

5. See Note 58, *infra*.

6. Docket No. 54.

7. The 209 documents are part of a total of 294 documents identified and briefly described in Hubler deposition Exhibit No. 50, Docket No. 46. Both parties have referred to those materials as the "Hubler Documents." The Court adopts this terminology.

8. The pugilistic exhibition is described in great detail at pp. 369–73 of the Hubler Deposition Transcript, Docket No. 65D. The Court is impressed by the concentration of the lawyers, particularly those directly engaged in the struggle for possession of the Hubler documents, which enabled them to remember to state exactly what had happened for the record. The result is an entertaining series of combat descriptions which prove conclusively that litigation is more than a battle of wits.

9. See note 40, *infra* and accompanying text for a precise delineation of the exact number of documents claimed to be privileged against disclosure.

10. F.R.Civ.Proc. 26(b)(1) provides that:
   (1) *In General.* Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

tion under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, it is first necessary to precisely delineate the appropriate scope and standard of such judicial review. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

The starting point for determination of the review standard is section 706 of the A.P.A., 5 U.S.C. § 706.[11] That section provides six basic standards by which propriety of administrative action is to be judicially measured. Of these standards, the "arbitrary and capricious" test, 5 U.S.C. § 706(2)(A) and the statutory mandate to set aside agency action that fails to satisfy various statutory, constitutional or procedural requirements, 5 U.S.C. § 706(2)(B), (C) and (D) govern *all* cases in which judicial review is authorized by section 701 and 702 of the A.P.A., 5 U.S.C. §§ 701 and 702.[12] *Overton Park, supra* at 414, 91 S.Ct. 814. Section 706 provides two additional review standards, the "substantial evidence test, 5 U.S.C. § 706(2)(E) and *de novo* review, 5 U.S.C. § 706(2)(F), both of which apply in only limited instances.

■ The "substantial evidence" test applies in only two situations. First, this test is properly employed to measure agency action based on an adjudicatory hearing. *Overton Park, supra* at 414, 91 S.Ct. 814; *Camp v. Pitts,* 411 U.S. 138, 141, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The only other opportunity for correct utilization of this test is review of agency findings made on a hearing record under 5 U.S.C. §§ 556 and 557. However, the applicability of these two sections are controlled by 5 U.S.C. § 553(c)[13] which authorizes review on the record under sections 556 and 557 only where some other statute requires such hearings to be on the record. *United States v. Allegheny-Ludlum Steel,* 406 U.S. 742, 756–8, 92 S.Ct. 1941, 32 L.Ed. 2d 453 (1972); *Overton Park, supra; Camp v. Pitts, supra. See, e. g., Dry Colors Manufacturers Ass'n, Inc. v. Dep't of Labor,* 486 F.2d 98, at 104, n. 8 (3d Cir. 1973); *Siegel v. Atomic Energy Commission,* 130 U.S.App.D.C. 307, 400 F.2d 778, 785 (1967). *See generally* 2 K. Davis, *Administrative Law Treatise* § 13.08 (1958 ed.).

■ *De novo* review is similarly limited to two specific sets of circumstance.

11. 5 U.S.C. § 706 provides:
To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

12. 5 U.S.C. § 701(a) provides that:
"(a) This chapter applies, according to the provisions thereof, except to the extent that—
(1) statutes preclude judicial review; or
(2) agency action is committed to agency discretion by law."
5 U.S.C. § 702 provides that:
"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review."

13. 5 U.S.C. § 553(c) provides in part that:
". . . When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection."

"First, such *de novo* review is authorized when the [agency] action is adjudicatory in nature and the agency fact finding procedures are inadequate. And, there may be independent judicial fact finding when issues that were not before the agency are raised in a proceeding to enforce non-adjudicatory agency action." *Overton Park, supra* 401 U.S. at 415, 91 S.Ct. at 823; *Camp v. Pitts, supra* 411 U.S. at 141-2, 93 S. Ct. 1241.

■ It is clear in the instant controversy that neither the "substantial evidence" test nor *de novo* review are applicable. First, this Court is not reviewing an adjudicatory agency proceeding. Nor is it reviewing the findings of a hearing required to be on the record under 5 U.S.C. §§ 556 and 557. While the Court has held that for purposes of preliminary injunctive relief the FTC's promulgation of the LB Program in August, 1974, constituted rulemaking under section 4 of the A.P.A., 5 U.S.C. § 553, there is nothing in the Federal Trade Commission statute, 15 U.S.C. § 41 *et seq.*, which requires such rulemaking to be on the record and accompanied by formal findings of fact. Secondly, this is a pre-enforcement proceeding, not an action to enforce non-adjudicatory agency action.[14] Accordingly, the "substantial evidence" test and *de novo* review are equally inapposite to this litigation.

Therefore, whatever review is ultimately undertaken, it will be largely centered around the "arbitrary or capricious" test. In addition, plaintiffs' arguments that the LB Program violates statutory, constitutional and procedural provisions will require review under the standards provided in 5 U.S.C. § 706(2)(B), (C) and (D).[15]

Plaintiffs have challenged the FTC's adoption of the LB Program on, at least, six separate grounds. These include, *inter alia*, claims that: (1) the Commission exceeded its statutory authority in issuing its order of August 2, 1974, establishing the LB Program; (2) the LB Program is excessively burdensome given the high cost of compliance and the allegedly dubious value of the information to be collected; (3) the ambiguous and occasionally contradictory reporting instructions, when combined with the requirement of certifying reported data as true at the risk of criminal sanctions, deprive plaintiffs of their due process rights under the Fifth Amendment; (4) the reporting requirements constitute an unconstitutional taking of property because of the high cost of compliance and the allegedly substantial risks regarding public dissemination of confidential information; (5) the reporting requirements violate their Fourth Amendment rights to be free from unwarranted searches; and (6) the FTC's promulgation of the LB Program failed to comply with procedural requirements articulated in the A.P.A.

Issue number 1 is governed by the standard enunciated in 5 U.S.C. § 706(2)(C).[16] Issues 3, 4, and 5 will all be controlled by the review standard contained in 5 U.S.C. § 706(2)(B).[17] Issue number 6,[18] will be controlled by 5 U.S.C. § 706(2)(D).

■■ The remaining contention that the LB Program is unduly burdensome must be measured by the arbitrary or capricious standard. Although the ultimate standard of review on this issue is quite narrow, the Court must conduct a

14. The Court does not mean to suggest that if this proceeding was an enforcement proceeding brought by the Commission *de novo* review would be either proper or appropriate. That question is not here presented and accordingly no views on it will be proffered.

15. See note 11 *supra*.

16. See note 11, *supra*.

17. *Id.*

18. The FTC having admitted non-compliance with the A.P.A., this question was initially answered in the negative with the issuance of a preliminary injunction as to plaintiff, A. O. Smith, et al., on February 19, 1975. The question of the correctness of issuance of that preliminary injunction is currently before the Third Circuit Court of Appeals.

searching inquiry into the facts surrounding the FTC's actions. *Overton Park, supra* 401 U.S. at 415–6, 95 S.Ct. 814. *See Bowman Transportation, Inc. v. Arkansas Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L. Ed.2d 447 (1974). In making a determination as to whether the agency's action was arbitrary or capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park, supra* 401 U.S. at 416, 91 S.Ct. at 823. *Bowman Transportation, supra* 419 U.S. at 285–6, 95 S.Ct. 438. *See generally,* L. Jaffe, Judicial Control of Administrative Action 182 (1965).

■ In *Overton Park, supra,* the "relevant factors" were statutorily articulated in the underlying statute which authorized the administrative action. In contrast, the relevant factors to be considered by the Commission in promulgating programs of the type typified by the LB Program are nowhere delineated in the statute.[19] Thus, there exists a question as to exactly what factors had to have been considered by the Commission in formulating the LB Program. While the resolution of this question is not presently required, it is clear at this juncture that significant discretion has been lodged with the Commission under 15 U.S.C. § 46. However, this broad

discretion cannot be taken to indicate there are no factors which the agency must consider in adopting the LB Program. *See* Davis, *Administrative Law Text,* 148.

Federal courts, in the post-*Overton* era, when faced with challenges to administrative action alleged to be arbitrary and capricious have · on occasion identified "relevant factors" by extrapolating the purposes of the underlying statutory authorization and translating those purposes into the precise factual context before them. *See, e. g., Hanly v. Mitchell,* 460 F.2d 640, 646–8 (2d Cir. 1972); *Getty Oil Company v. Ruckelshaus,* 467 F.2d 349, 355, 357 (3d Cir. 1972); *Transcontinental Gas Pipe Line Corporation v. F. P. C.,* 160 U.S.App.D. C. 1, 488 F.2d 1325, 1329–30 (1973); *Getty Oil Company v. Ruckelshaus,* 342 F.Supp. 1006, 1015 (D.Del.1972). Still other federal courts have articulated relevant factors by reference solely to the factual circumstances extant at the point an administrative decision is made. *See e. g., Duquesne Light Company v. EPA,* 522 F.2d 1186 (3d Cir. 1975). While this technique might, at first blush, appear to smack of judicial intrusion into the domain of agency discretion and expertise, *cf. EDF v. Ruckelshaus,* 142 U.S. App.D.C. 74, 439 F.2d 584, 598 (1971) (dissenting opinion), such an undertaking is designed to protect the exercise of

---

19. The statute upon which the FTC relies authorizes the Commission to require periodic information reporting by economic entities engaged in interstate commerce. 15 U.S.C. A. § 46. Section 46(a) and (b) provide:

The Commission shall also have power—
Investigation of corporations
(a) to gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices and management of any corporation engaged in commerce, excepting banks and common carriers subject to the Act to regulate commerce, and its relation to other corporations and to individuals, associations, and partnerships.
Reports by corporations
(b) To require, by general or special orders, corporations engaged in commerce, excepting banks and common carriers sub-

ject to the Act to regulate commerce, or any class of them, or any of them, respectively, to file with the Commission in such form as the Commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the Commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the Commission may prescribe, and shall be filed with the Commission within such reasonable period as the Commission may prescribe, unless additional time be granted in any case by the Commission.

an agency's discretion by providing a legal framework of statutorily-emanating guidelines and standards within which such discretionary authority must be exercised. *See EDF v. Ruckelshaus, supra* at 597–8. *Cf.* Davis, *Administrative Law Text*, 148. Accordingly, the eventual inquiry into the Commission's actions in promulgating the LB Program will ultimately focus upon whether the Commission considered all relevant factors and whether there have been any clear errors of judgment. However, in conducting its review, the Court "is not empowered to substitute its judgment for that of the agency." *Overton Park, supra.*

B. The Appropriateness of Discovery

The FTC maintains no discovery whatsoever is appropriate in this action. It argues alternatively that this is either a summary enforcement proceeding where discovery is ordinarily improper or a pre-enforcement review of agency action in which judicial review is confined to the administrative record. Under either contention, any discovery, whether in the form of depositions, interrogatories or requests for production of documents, is, according to the Commission, unnecessary.

■ The Commission's argument that this is merely a summary proceeding to enforce its orders to file Form LB can itself be disposed of in summary fashion. Rather than being an enforcement proceeding brought by the Commission, this is a pre-enforcement review action [20] brought by several corporate entities subject to the reporting requirements of the Commission's LB Program. As such the Court is not concerned with enforcement of the Commission's orders but is instead examining the LB Program itself in order to adjudicate plaintiffs' various contentions regarding the Program's alleged illegality.[21]

The Commission's second argument that no discovery is proper where review is confined to the administrative record or only legal questions are raised is more troublesome. First, the Commission is correct in maintaining that review of administrative action alleged to be arbitrary and capricious is to be conducted through an examination of the administrative record which confronted the agency at the time it acted. *Overton Park, supra; Camp v. Pitts, supra; Dry Colors Manufacturers Ass'n v. Dep't of Labor*, 486 F.2d 98, 104 n. 8 (3d Cir. 1973); *Bradley v. Weinberger*, 483 F.2d 410, 414 (1st Cir. 1973). However, serious questions have been raised in this proceeding as to the scope of the administrative record to be reviewed and, as a result, a short digression on that issue is in order.

i) Composition of the Administrative Record

■ At oral argument on the competing discovery motions the Commission argued it had the right to designate whatever items it considered to be the administrative record. Accordingly, it urged it was under no duty to submit either to the Court or to its opponents all materials employed or relied upon by the Commission in promulgating its Line of Business Program. This contention is unacceptable. Allowing administrative agencies to preclude judicial access to materials relied upon by an agency in taking whatever action is then being subject to judicial scrutiny would make a mockery of judicial review. Moreover, it would prevent courts from discharging their duty to make a "searching and careful" inquiry to determine whether all relevant factors were considered by the agency and whether there has been a clear error of agency judgment as set forth in *Overton Park, supra.*[22] *Appa-*

20. See Opinion of February 19, 1975 and March 18, 1975 in this and related cases.

21. See Docket No. 2 at 22, for a listing of plaintiffs' allegations.

22. In the instant case the Commission was ordered to prepare a list of materials it considered to be the administrative record. An examination of this list (Docket No. 70) re-

*lacian Power Company v. Environmental Protection Agency,* 477 F.2d 495, 507 (4th Cir. 1973). *See Silva v. Lynn,* 482 F.2d 1282, 1283 n. 1 (1st Cir. 1973). It is therefore not surprising that the weight of judicial authority is contrary to the Commission's expressed desire to designate selected documents as the administrative record. The Supreme Court in *Overton Park* emphasized that review is to be conducted upon the "full administrative record" before the agency at the time it made its decision, 401 U.S. at 420, 91 S.Ct. 814. Several Circuit Courts of Appeal have adopted similarly stringent and all encompassing standards for determining the scope of administrative records.[23] Accordingly, the Commission will be ordered to promptly certify to this Court *all* materials considered by the Commissioners in their adoption of the LB Program on August 2, 1974.[24]

■ It is possible to argue that since judicial review of administrative action alleged to be arbitrary and capricious encompasses an examination of the administrative record to determine whether all relevant factors were considered, *Overton Park, supra,* any portion of an administrative record that reveals administrative consideration of all relevant factors should be sufficient to delimit further judicial inquiry. However, such a position cannot be maintained because one of the many bases which justify the "substantial" nature of this type of judicial inquiry is to determine if any impermissible factors have entered into an agency's reasoning process. *See, E. D.*

*F. v. Ruckelshaus,* 142 U.S.App.D.C. 74, 439 F.2d 584, 597–8 (1971). *See, e. g., D. C. Federation of Civic Associations v. Volpe,* 148 U.S.App.D.C. 207, 459 F.2d 1231 (1972).

ii) *The Importance of Administrative Findings*

■ Federal courts engaged in judicial review of administrative action alleged to be arbitrary and capricious have often emphasized administrative findings as a much needed aid for properly focusing the "substantial inquiry" necessitated by such allegations. *See generally* Davis, *Administrative Law Text* 148, 332–4 (1972); Scott, "In Quest of Reason: The Licensing Decisions of The Federal Banking Agencies," 42 *Chi.L.Rev.* 235 (1975). In *Burlington Truck Lines v. U. S.,* 371 U. S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), the Supreme Court stated effective judicial review, especially where discretionary administrative actions were challenged, required findings or explanations sufficient to reveal the basis of administrative action so that a determination could be made as to whether the contested acts were actually within the agency's discretion.[25] *Id.* at 167–9, 83 S.Ct. 239. Moreover, courts are not free to accept explanations of counsel for administrative decisions not employed by the agency and subsequent to the occurrence of the administrative action being reviewed. *Id.* at 168–9, 83 S. Ct. 239. This is because judicial acceptance of such "post-hoc rationalizations" would propel reviewing courts " 'into the

veals a sparse collection of items which would render a "rational determination" by this Court on the "arbitrary and capricious" test well nigh impossible. *Appalachian Power, infra* at 507.

23. *See, e. g., Bradley v. Weinberger, supra* at 414; *Silva v. Lynn, supra* at 1283 n. 1; *Appalachian Power, supra* at 507; *Dry Colors, supra* at 104, n. 8. *Accord, Environmental Defense Fund v. Ruckelshaus,* 142 U.S.App. D.C. 74, 439 F.2d 584, 597–8 (1971); *Chrysler Corporation v. Dep't of Transportation,* 472 F.2d 659, 669 (6th Cir. 1972).

24. 39 Fed.Reg. 30377, August 22, 1974.

25. Administrative findings were required by statute in *Burlington* by 5 U.S.C. § 1007(b) (now 5 U.S.C. § 557(c)(3)(A)). No such *formal* findings are mandated in the instant action. *Allegheny-Ludlum Steel, supra.* However, the Court's articulation of the important function of administrative findings in *Burlington* was far broader than that required by the relevant statute and thus *Burlington* is not read as limited to situations where formal findings are required after a hearing "on the record" under 5 U.S.C. § 557(c)(3)(A). *Compare Overton Park, supra* and *Camp v. Pitts, supra* with *Allegheny-Ludlum Steel, supra.*

domain which Congress has set aside exclusively for the administrative agency.'" *Id.* at 169, 83 S.Ct. at 246 *citing SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

In *Overton Park*, the Supreme Court once again took notice of the need for informal findings that serve to explain administrative action. In that case, even though review on remand was to be conducted "on the full administrative record that was before the [agency] at the time [it] made [its] decision[s]," 401 U.S. at 420, 91 S.Ct. at 825, further explanations by the agency might be necessary if the "bare record" failed to disclose which factors were considered. *Id.* See Davis, *Administrative Law Text* 332–4. Similarly, in *Camp v. Pitts, supra*, mention was again made of the need for contemporaneous explanation of agency action. 411 U.S. at 143, 93 S.Ct. 1241. Nor has the utility of informal findings as a device for determining whether various relevant factors were administratively considered been lost upon the lower federal courts. *See, e. g., Environmental Defense Fund v. Ruckelshaus*, 142 U.S.App.D.C. 74, 439 F.2d 584, 597–8 (1971); [26] *Transcontinental Gas Pipe Line Corporation v. FPC*, 160 U.S.App.D.C. 1, 488 F.2d 1325, 1330 (1973). *Accord, Dry Colors, supra* at 105–6. *Cf. National Nutritional Food Ass'n v. FDA*, 491 F.2d 1141, 1145 n. 5 (2d Cir. 1974); Scott, *In Quest of Reason, supra.*

The parties in this case have clashed sharply on the question whether the Commission made any informal findings or whether the "stated justification for informal action does not provide an adequate basis for judicial review." *Camp v. Pitts, supra* 411 U.S. at 138, 93 S.Ct. at 1242. Plaintiffs claim that the Commission made no findings and rendered no "contemporaneous explanation" of Commission action in adoption of the LB Program. The Commission however claims that there are findings.[27] These, according to the Commission, include letters issued by the Commission in connection with its denials of motions to quash its Order to File Form LB [28] (September 24, 1974), a statement by the Commission denying plaintiffs' renewed motions to quash [29] (January 7, 1975), two staff reports [30] prepared in March and May of 1974 [31] and a letter from Commissioner Lewis Engman to Senator Philip A. Hart dated May 15, 1974.[32] The Court disagrees and concludes it is unable to treat these materials as "contemporaneous explanations" of the Commission's August 2, 1974 adoption of the LB Program.

The two staff reports are not explanations by the Commission, but rather by its staff.[33] Further, they were prepared *prior* to the August 2, 1974 promulgation of the LB Program and are thus unfit for treatment as contemporaneous informal findings by the Commission. Similarly, the May 15, 1974 Engman-

---

**26.** In *EDF v. Ruckelshaus, supra,* the D.C. Circuit Court of Appeals stated that: "We stand on the threshhold of a new era in the history of the long and fruitful collaboration of administrative agencies and reviewing courts. For many years . . . [c]ourts occasionally asserted, but less often exercised, the power to set aside agency action on the ground that an impermissible factor had entered into the decision, or a crucial factor had not been considered. Gradually, however, that power has come into more frequent use, and with it, the requirements that administrators articulate the factors on which they base their decisions." 439 F.2d at 597.

**27.** Docket No. 62, p. 5.

**28.** *Id.*

**29.** *Id.*

**30.** In a classic instance of having one's cake and eating it too, the Commission, at the same time it urges these two internal staff reports constitute part of its findings, also maintains that staff memos are never part of an administrative record. Docket No. 60, p. 14.

**31.** *Id.*

**32.** Docket No. 60, p. 8.

**33.** The distinction between statements or acts of an agency and those of its staff has in some circumstances been deemed of great significance. *U. S. v. Citizens & Southern National Bank*, 422 U.S. 86, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975).

Hart letter cannot be considered as constituting Commission findings because it issued some two and one-half months before the Commission adopted its LB Program by resolution dated August 2, 1974.[34]

The Commission responses denying the motions to quash and renewed motions to quash, while perhaps forming part of the administrative record, cf., Bradley v. Weinberger, supra at 415, cannot be treated as a "contemporaneous explanation" of the FTC's promulgation of the LB Program. Not only did they post-date the August 2nd decision by eight weeks and five months respectively, but their temporal context serves to render them susceptible to characterization as the type of "post-hoc rationalization" condemned for review purposes in Overton Park, supra 401 U.S. at 419, 91 S.Ct. 814. While these two statements could serve as findings or explanations of the Commission's reasons for denying the two sets of motions to quash, the administrative activity under review in this Court is the adoption of the LB Program, not the refusal to quash the Orders to File Form LB. "Judicial review must operate to ensure that the administrative process itself will confine and control the exercise of discretion. Courts should require administrative officers to articulate the standards and principles that govern their discretionary decisions in as much detail as possible." EDF v. Ruckelshaus, supra at 598.

Were reviewing courts to treat as "contemporaneous explanations" the statements of agencies issued not in conjunction with administrative action, but some time afterwards when the propriety of that action is under attack, that would amount to judicial sanctioning of administrative practice based on a principle of "act now; figure out why later." Administrative agencies cannot be free to act unfettered by any standards or parameters of authority as long as they could subsequently advance some reasons as to why the action was originally undertaken. The integrity of the administrative process is not debased, but strengthened by the requirement of contemporaneous findings. The probative character of an explanation issued contemporaneously with particular agency action is superior to a statement made when action previously taken is attacked and justifications for it are sought.

It is within the realm of discretionary administrative action that informal findings or explanations assume the greatest importance in terms of providing a principled framework, both for administrative decision-making and judicial review. See Davis, Administrative Law Text 332–4 (1972); EDF v. Ruckelshaus, supra at 597–8. "Contemporaneous" will not be stretched to reach a result fundamentally inconsistent with the purpose of requiring explanations of agency action. Accordingly, the Court finds that for purposes of judicial review there are no "contemporaneous explanations" or findings accompanying agency action sufficient to indicate what factors were considered by the Commission.

D. Remedies for a Lack of "Contemporaneous Explanations" of Administrative Action

In Overton Park the Supreme Court also held that where the bare administrative record does not disclose what factors were considered in connection with agency action, a reviewing court could properly require an explanation in order to aid its determination as to whether a challenged action was arbitrary or capricious. 401 U.S. at 420, 91 S.Ct. 814. Further, the Court also held the absence of "administrative findings that were made at the same time as the decision" would justify requiring "the administrative officials who participated in the decision to give testimony explaining their action." Id. The Court

---

34. No opinion is expressed as to whether the Engman-Hart letter could serve as Commission findings were it issued contemporaneously with the promulgation of the LB Program.

did, however, indicate the essentially limited occasions for such inquiries by requiring a "strong showing of bad faith or improper behavior" when contemporaneous findings exist to justify an examination of the decision-makers' mental processes. *Id. citing U. S. v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941).

In *Camp v. Pitts, supra,* the class of administrative record that justified supplementation was extended from cases in which no agency findings had been made to either those where the "stated justification for informal action does not provide an adequate basis for judicial review," 411 U.S. 138, 93 S.Ct. at 1242 or " . . . there was such failure to explain administrative action as to frustrate effective judicial review . . . ." *Id.* at 142–3, 93 S.Ct. at 1244. *See National Nutritional Foods Ass'n v. FDA, supra* at 1145, n. 5.

The Commission relies on several cases for the proposition that discovery procedures or the taking of testimony are only proper in the context of judicial review of administrative action when a showing of bad faith has been made. This reliance is misplaced. In *Bradley v. Weinberger, supra,* the First Circuit never reached the issue sub judice. Similarly, in *Dry Colors, supra,* the Third Circuit's statement with respect to the scope of judicial review expressly assumed the existence of administrative findings. *See Id.,* 486 F.2d at 104, n. 8. Finally, both the Second and Fifth Circuit in *National Nutritional Foods Ass'n v. FDA, supra* at 1145 and *Bank of Commerce of Laredo v. City National Bank of Laredo,* 484 F.2d 284, 288 (5th Cir. 1973),[35] had specifically found that "contemporaneous explanations" of administrative action were present in both cases. Thus, the cited cases are distinguishable from the controversy at bar

because of this Court's conclusion that "contemporaneous explanations" of the Commission's actions in adopting the LB Program are lacking. *Supra* pp. 1011–1012.

The Supreme Court did not provide explicit guidelines in either *Overton Park* or *Camp* for District Courts to follow to obtain further "explanation" for allegedly arbitrary and capricious agency action. Instead, the Court chose to defer to the fact-finding expertise of the lower federal courts and placed the specific choice of means within the discretion of the reviewing court. *Compare Overton Park, supra* 401 U.S. at 420–1, 91 S.Ct. 814 with *Camp v. Pitts, supra* 411 U.S. at 142–3, 93 S.Ct. 1241.

■ The Commission has suggested that if this Court should find the administrative record to be inadequate because of a lack of contemporaneous explanations, a remand to the Commission would be appropriate.[36] The Court is unwilling to adopt this suggestion for the following reasons. In *Overton Park* the Supreme Court counseled strongly against the use of "post-hoc rationalizations" to reveal the basis of prior administrative acts. 401 U.S. at 419–21, 91 S.Ct. 814. Further, special warning with regard to the "post-hoc" nature of findings prepared subsequent to the actual administrative decision is found in the Court's advice that any such materials "must be viewed critically." *Id.* at 420, 91 S.Ct. 814. This Court is similarly sensitive to the unsatisfactory dynamics of such a remand and accordingly deems it unwise in the instant controversy.

By contrast, utilization of the discovery procedures available under the Federal Rules of Civil Procedure, albeit to a limited extent, appears to provide a more satisfactory, and entirely appropriate,[37] means of uncovering the

35. *Bank of Commerce of Laredo, supra,* has been described as a "remarkably obtuse opinion." Scott, *In Quest of Reason,* 42 *Chi.L.Rev.* 235, 266 (1975). Professor Scott's criticisms of that case include allegations that the Fifth Circuit ignored *Overton Park* and relied upon *Camp v. Pitts* for a

proposition directly contrary to its actual holding. 42 *Chi.L.Rev.* at 266–7.

36. Docket No. 60, p. 10.

37. *Carpenters 46 County Board v. Construction Industry Stabilization Committee,* 18 FR Serv.2d 1042 (N.D.Cal.1974); *Nuclear*

rationale behind the Commission's adoption of the LB Program.[38] In particular, the adversarial nature of most discovery tools (depositions, interrogatories and requests for production) provides an ideal counter to any tendency of an agency requested to unilaterally prepare post-hoc findings to place a highly refined and, perhaps unwarranted, gloss upon prior decision-making.

While discovery is appropriate, it will not necessarily be permitted to be as time consuming as the more common types of plenary actions. The scope of discovery under the Federal Rules of Civil Procedure is generally governed by Rule 26(b)(1) which provides that: "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . ." In general the notion of relevance inherent in Rule 26(b)(1) has been given a very broad scope. 4

*Moore's Federal Practice* ¶ 26.56[1] at 26–131. Relevance is to be measured, not according to the specific issues raised by the pleadings, but rather by reference to the nature of the subject matter. *See Id.* at 26–120–22. Against this liberal standard for delimiting the parameters of discovery stands the caveat of the Supreme Court in *Overton Park* that: "If the District Court decides that additional explanation is necessary, that court should consider which method will prove the most expeditious so that full review may be had as soon as possible." 401 U.S. at 420–1, 91 S.Ct. at 826. In reviewing administrative decisions, it is held that the usual broad scope of discovery is subject to restriction in order that such review may be had promptly. Accordingly, whatever further discovery may eventually be had in this action will be of an essentially limited nature and should be framed in a manner consistent with the narrow purposes of such discovery.[39]

---

*Data, Inc. v. AEC,* 364 F.Supp. 423, 425 (N.D.Ill.1973). *Cf. National Nutritional Foods Ass'n v. FDA, supra* at 1145; *Aleut League v. Atomic Energy Commission,* 337 F.Supp. 534, 541 (D.Alaska 1971). *But cf., Bank of Commerce v. Laredo, supra* at 287. But see note 35 *supra.*

38. While the actual discovery eventually had in this matter will be limited solely to curing the lack of a "contemporaneous explanation" of administrative action, this serves adequately to distinguish the instant pre-enforcement review from an action brought to enforce agency action. In such a proceeding the judicial focus is not directed towards a searching inquiry of the bases upon which an agency has acted. Instead, attention is focused upon the particular order sought to be enforced. As a result the degree and nature of any discovery in an enforcement proceeding is wholly distinguishable from the broad review here undertaken by the Court where discovery is being utilized to remedy the lack of administrative findings necessary to effectuate a complete and searching review of administrative action. *A. O. Smith et al. v. FTC et al.,* 396 F.Supp. at 1115, 1116 (D.Del.1975). *See U. S. v. Associated Merchandising Corp.,* 256 F.Supp. 318 (S.D. N.Y.1966). *Cf. Donaldson v. United States,* 400 U.S. 517, 528–9 and n. 11, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971); *United States v. Howard,* 360 F.2d 373 (3d Cir. 1966).

39. It is noted a conflict appears to exist when the concept of a "searching and careful" judicial inquiry is placed against the restriction of such review to a record which consists solely of materials actually employed by administrative decision-makers in undertaking the acts subsequently under review. Due to the size of most administrative agencies, a high degree of responsibility is often delegated to staff members. Thus, in preparing a report to be utilized by the decision-makers, an administrative ' staff member might rely upon statistical or technological data gathered by the agency. Since the report thereafter submitted to the agency will not contain such data, but merely rely upon it, that data does not ordinarily become part of the administrative record. Because such data might itself be totally incorrect or otherwise invalid, both the staff's and decision-maker's reliance is misplaced. However, since such materials are not part of the record there is no readily apparent way to discover that the data is misleading or incorrect. In an ordinary civil action such lacunae would be uncovered through utilization of the liberal discovery procedures authorized by the Federal Rules of Civil Procedure. In suits involving judicial review of administrative action such discovery possibly cannot ordinarily be had due to the lack of relevance under Rule 26(b)(1) caused by the fact that neither the data nor

## II. *The Commission's Claims of Executive Privilege*

Plaintiffs, first through requests for production, and now by motion to compel, seek access to 209 Commission documents identified and briefly described in Hubler Deposition Exhibit No. 50.[40] The Commission in turn responded by raising claims of executive privilege with respect to 129 documents and arguing that all the documents are nondiscoverable on relevance grounds. The privilege claims attaching to 10 documents or portions of those documents have now been mooted by release in a contemporaneous, but unrelated, agency decision in a Freedom of Information Act proceeding.

Executive privilege also reared its head in the context of a deposition taken by plaintiffs of a member of the Commission staff. These claims initially arose when the employee was directed by Commission counsel not to answer 17 questions on the ground that executive privilege attached to the subject matter sought to be disclosed by plaintiffs' deposition questions.[41]

By letter [42] dated June 10, 1975 Lewis A. Engman, Chairman, FTC, purported to formally raise the privilege claims with regard to the Hubler documents, as well as reiterating the privilege claims emanating from the Hubler deposition itself. The letter, which was not submitted as an affidavit, gives no reasons as to how or why the Commission would be harmed through disclosure of either the documents or the information sought by the deposition questions. Nor does the letter give any indication that Commissioner Engman made the decision to invoke executive privilege after personal consideration of the documents and their content.

### A. *Executive Privilege in General*

▮ The Commission has labeled the privilege it is raising as the privilege against disclosure of intra-agency advis-

---

its weaknesses can be employed by a court when review is limited to the administrative record.

Alternative resolutions of the foregoing conflict might include enlarging the administrative record for this limited purpose to include staff reports indirectly relied upon by the agency decision makers or utilizing discovery procedures notwithstanding the "relevance" problem under Fed.R.Civ.Proc. 26(b)(1).

40. See Docket No. 46. There are a total of 294 separate *documents listed in Hubler* Deposition Exhibit No. 50. In a separate Freedom of Information Act proceeding the Commission has agreed to allow a member of the public access to 125 of these documents, and concurrently agreed to make them similarly available to the plaintiffs in the instant case. However, some of the documents released pursuant to the independent Freedom of Information Act request were never requested by plaintiffs.

41. Docket No. 54, Exhibits A through M.

42. The contents of the letter is as follows: "Re: A. O. Smith Corporation, et al. v. Federal Trade Commission, et al., Civil Action No. 75–15—FTC File 99–199

Dear Judge Schwartz:

. Plaintiffs in the above-captioned action have moved the court for an order compel-

ling the Federal Trade Commission to produce certain documents listed in Hubler Deposition Exhibit 50 and to permit Myron J. Hubler to answer certain questions asked of him during the taking of his deposition to which Commission counsel objected and directed Mr. Hubler not to answer. (The questions are set forth in Exhibits A through M to plaintiffs' motion.)

I am hereby formally claiming the Commission's privilege for intra-governmental documents reflecting advisory opinions, recommendations and deliberations as to the following documents identified in Hubler Deposition Exhibit 50: Hubler Documents 1–4, 7–12, 15–57, 21–22, 25, 29–30, 33, 35–37, 39–41, 45, 48–50, 56–58, 63, 66–68, 70, 72–75, 77, 79–80, 105, 117, 130, 134, 138, 142, 144, 151, 159–161, 164, 166–68, 171, 176, 195–210, 223–225, 227–229, 238, 239, 241, 243, 246, 250, 252–257, 261–294.

I am also raising the privilege for intra-governmental communications reflecting advisory opinions, recommendations and deliberations with respect to the questions indicated in Exhibits A through M to plaintiffs' motion.

Respectfully,

/s/ Lewis A. Engman
Lewis A. Engman
Chairman

ory opinions, recommendations and deliberations. Since describing the privilege in these terms creates a substantial risk of confusion with a Freedom of Information Act provision[43] which exempts from disclosure "inter-agency or intra-agency memorandum or letters which would not be available by law to a party other than an agency in litigation with the agency," the privilege raised by the Commission under Rule 26[44] will instead be described as executive privilege. Cf. U. S. v. Article of Drug, 43 F.R.D. 181, 190 (D.Del.1967). The purpose behind the executive privilege against disclosure of intra-agency advisory communications is the encouragement of frank discussion within the government as regards the formulation of policy. U. S. v. Berrigan, 482 F.2d 171, 181 (3d Cir. 1973). This is because "human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decision-making process." U. S. v. Nixon, 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974). Accord, Ackerly v. Ley, 137 U.S.App.D.C. 133, 420 F.2d 1336, 1341 (1969) ("there are enough incentives as it is for playing it safe and listing with the wind"). See also, NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975).

■ This privilege is not absolute, U. S. v. Nixon, supra, but instead is subject to at least two significant qualifications. First, the privilege does not attach to purely factual communications within or between agencies, the disclosure of which would not compromise military or state secrets. E.P.A. v. Mink, 410 U.S. 73, 87–8, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). Moreover, factual material contained in deliberative memoranda has generally been held discoverable if susceptible to severance from its context. Id. See e.g., Machin v. Zuckert, 114 U.S.App.D.C. 335, 316 F.2d 336, cert. denied 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 1214 (1963); Boeing Airplane Co. v. Coggeshall, 108 U.S.App.D. C. 106, 280 F.2d 654 (1960); Freeman v. Seligson, 132 U.S.App.D.C. 56, 405 F. 2d 1326 (1968). Cf. Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 393, 463 F.2d 788, 792 (1971). The same distinction is applied under the analogous Freedom of Information Act provision, 5 U.S.C. § 552(b)(5). Soucie v. David, 145 U.S. App.D.C. 144, 448 F.2d 1067 (1971); Schwartz v. IRS, 511 F.2d 1303 (D.C. Cir. 1975).[45]

■ Secondly, even those materials actually encompassed within the limited confines of the privilege are not absolutely exempted from disclosure. Instead, the privilege can be overridden in appropriate circumstances. See, e.g., U. S. v. Nixon, supra; Black v. Sheraton Corp., 371 F.Supp. 97 (D.D.C.1974). While the exact showing necessary to surmount a governmental claim of privilege is unclear,[46] what is basically involved in each case is an ad hoc balancing of individual need for the materials against the harm resulting from any such disclosure. In fact, it is this as-

---

43. 5 U.S.C. § 552(b)(5).

44. Rule 26 allows discovery of any relevant matter not privileged from disclosure. See note 10, supra.

45. While it is clear that the fifth exemption of the Freedom of Information Act, 5 U.S.C. § 552(b)(5) in no way affects the scope of materials discoverable in plenary civil actions, 4 Moore's Federal Practice ¶ 26.61 [4.3] at 26–277 (1974 ed.); Pleasant Hill Bank v. U. S., 58 F.R.D. 97, 100 (W.D.Mo.1973), cases construing that Freedom of Information Act exemption are readily analogous to

cases where executive privilege is being examined under the aegis of Rule 26 discovery proceedings.

46. Some cases speak in terms of a "pressing need" on the part of litigants in order to overcome a properly raised claim of executive privilege, SEC v. Bausch & Lomb Co., 19 Fed.Rules Serv.2d 332 (S.D.N.Y.1974), while others view the central issue as "whether the damage resulting from disclosure outweighs the need for a just resolution of a legal dispute." Black v. Sheraton, supra.

sessment of individual need that most completely distinguishes adjudications of executive privilege under the Freedom of Information Act, where an individual's need for materials is deemed irrelevant. *SEC v. National Student Marketing Corp.*, 18 Fed.Rules Serv.2d 1302, 1308 (D.D.C.1974). *See generally*, Note, "The Freedom of Information Act and the Exemption for Intra-Agency Memoranda." 86 *Harv.L.Rev.* 1047 (1972).

▮▮▮ As with any privilege the burden is upon the claimant of executive privilege to demonstrate a proper entitlement to exemption from disclosure. *Accord, U. S. v. Article of Drug, supra. Cf. International Paper Company v. Fibreboard Corporation*, 63 F.R.D. 88, 93 (D.Del.1974). To properly support a claim of executive privilege at least three requirements must be satisfied. First, the privilege must be claimed by the head of the applicable agency after actual personal consideration by that officer. *U. S. v. Reynolds*, 345 U.S. 1, 7–8, 73 S.Ct. 528, 97 L.Ed. 727 (1953). Secondly, there must be "a specific designation and description of the documents" claimed to be privileged. *Black v. Sheraton, supra.* This is necessary in order that a court be able to make a knowledgable decision as to whether any document or portion thereof actually contains advisory or deliberative materials. Any attempts to invoke executive privilege in the absence of this specific factual showing are actually attempts to interfere with the proper functioning of the judicial branch of our government by appropriating the means of this decision to the executive branch. *Cf. U. S. v. Nixon, supra.* Finally, there must be

a demonstration of "precise and certain reasons for preserving" the confidentiality of the governmental communications. *Black v. Sheraton, supra.* A close reading of cases where claims of executive privilege were raised indicates that the necessary facts have generally been required to be raised by affidavit. *See, e.g., U. S. v. Reynolds, supra; Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318 (D.D.C.1966), *aff'd sub nom., V.E.B. Carl Zeiss, Jena v. Clark*, 128 U.S.App.D.C. 10, 384 F.2d 979 (1967), *cert. denied*, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967); *Black v. Sheraton Corporation, supra.* Further, this Court requires the factual basis for other privilege claims to be made by affidavit. *International Paper Company v. Fibreboard Corporation, supra*, 63 F.R.D. at 94. However, for reasons that will shortly appear, it is unnecessary to decide whether the factual showing necessary to support a claim of executive privilege must be made by affidavit.[47]

### B. *The Hubler Documents*

For a variety of reasons, the Court finds itself unable to properly adjudicate the Commission's claims of executive privilege. Moreover, it is held that the Commission has yet to raise any executive privilege claims whatsoever because of certain serious deficiencies in the manner the Commission has chosen to press these claims.

▮▮▮ While the Commission has fulfilled the requirement that executive privilege be raised by the head of an agency,[48] *U. S. v. Reynolds, supra*, it has failed to satisfactorily comply with at least two other requirements. First, the

---

47. See discussion, *infra* pp. 1016–1018.

48. Plaintiffs have challenged whether the Chairman of the FTC is the "head" of the Commission for purposes of asserting executive privilege claims with arguments that the Chairman is not able to act on behalf of the Commission as a whole. The Court finds this argument to be unpersuasive because neo-literal compliance with the requirement that an agency head act in this context is unnecessary. That requirement was de-

signed to deter governmental units from too freely claiming a privilege that is not to be lightly invoked, *U. S. v. Reynolds, supra*, by assuring that some one in a position of high authority could examine the materials involved from a vantage point involving both expertise and an overview-type perspective. It is impossible to suggest that allowing the FTC Chairman to raise these claims will undermine the purposes behind this requirement.

"specific designation and description of the documents," *Black v. Sheraton Corporation, supra*, is lacking in several crucial respects. The Commission did, through Chairman Engman's letter, specify the particular documents claimed as privileged from disclosure. In addition, the record does contain a document[49] which provides some information on each document in terms of its general inter-agency routing, its date of preparation and its title. However, little or no information is provided as to the actual content of various documents. Since it is clear that excisable factual portions are, if relevant, discoverable, and since certain documents[50] appear, upon reading the attenuated descriptions, to contain largely factual material, the failure to fully describe the documents precludes the Court from any *informed* analysis of what documents, or portions thereof, actually contain the type of advisory communications protected by the privilege. Similarly, the lack of specificity renders an assessment of the potential harm resulting from disclosure impossible, thereby preventing the Court from balancing such harm against plaintiffs' needs to determine whether to override any claims of privilege.

The second serious deficiency in the Commission's approach is its total failure to proffer "precise and certain" reasons for preserving the confidentiality of the requested documents. *Black v. Sheraton Corporation, supra*. Without such information, a court cannot employ the balancing process appropriate to a resolution of this controversy. While the Court notes its serious doubts as to whether plaintiffs will be able to demonstrate a level of need sufficient to overcome executive privilege with respect to these documents,[51] until the Court can find that reasons exist for shielding these materials from disclosure because they contain advisory communications, no further adjudication of these claims can occur.

These deficiencies, when combined with Chairman Engman's total and absolute failure to indicate that he had engaged in any personal review of these documents,[52] are sufficient to support a finding that the Commission has yet to raise any executive privilege with respect to these documents. This is because an improperly raised claim of privilege is no privilege at all. *Black v. Sheraton Corporation, supra* at 101; *International Paper Company v. Fibreboard Corporation, supra* at 93. Thus, the Court would be totally justified at this juncture in ruling against the Commission on its claims of executive privilege, particularly in view of the fact that the Commission was previously made aware of the shortcomings inherent in its prior attempts to raise executive privilege as a barrier to discovery.[53] However, because the public interest is a factor to be considered in determining the proper scope of discovery, 4 *Moore's Federal Practice* ¶ 26.60[3] (1972 ed.), it is concluded the public interest would not be served at this point by a finding that no privilege attaches to these documents as a result of the Commission's

49. Hubler Deposition Exhibit 50. See Docket No. 46, Appendix A.

50. *See, e. g.*, Document No. 11, Docket No. 46, Appendix at 2.

51. See note 55, *infra*.

52. Although an inference could be drawn that Chairman Engman did indeed examine the documents prior to asserting his claim of executive privilege, the Court is unwilling to indulge in such speculation. Not only does the unverified character of the Engman letter make attempts to raise inferences somewhat troublesome, but the commission itself

argued in its briefs that providing greater specificity with respect to the documents would moot the claims of burden it has also raised as a bar to this discovery. Thus, the exact opposite inference, namely that *no* one at the Commission has examined these documents, may well be the more appropriate inference.

53. At a hearing on March 3, 1975 the Court, in denying a prior Commission motion for a protective order, ruled that the Commission had failed to properly invoke executive privilege. (Transcript 68, March 3, 1975.)

inability to properly raise its claims. Therefore, the Commission will be allowed a final "third bite [54] at the apple" on its executive privilege claim.

The Commission will be required to mend _all_ the multitudinous flaws that currently beset its claims of executive privilege. Central to this task will be completion of a descriptive, full and specific itemization of the various documents being claimed as privileged. Further, the basis for every claim of privilege will have to be shown to enable proper judicial resolution of these questions. Finally, if any portions of the putatively privileged documents contain factual information, the Commission will have to demonstrate the impossibility of extricating those factual portions. As a last resort, to the extent that greater illumination of documentary contents cannot occur without essentially disclosing the actual privileged contents, the Commission will have to submit any such documents for _in camera_ review by the Court. Contemporaneously, the plaintiffs will be allowed further opportunity to demonstrate their need for such documents bearing in mind the close relationship between need, relevance and the scope of review in this action.[55]

## C. _The Hubler Deposition_

■ The decisional posture of the remaining privilege claims raised during the taking of the Hubler deposition is similar to that taken with respect to the documents claimed as privileged. While no greater specificity is needed in this context because the deposition questions claimed to invade the province of protected advisory communications speak for themselves, the failure to articulate "precise and certain reasons for preserving their confidentiality," _Black v. Sheraton Corporation, supra,_ once again precludes utilization of the requisite balancing test. Thus, even though the subject-matter sought to be elicited by the various questions is within the class of intra-agency communications designed to be protected by executive privilege, the Court can go no further without some information, other than its _sua sponte_ speculation, _U. S. v. Article of Drug, supra,_ as to the quantum and type of harm that would result from forced disclosure of these communications. Therefore, with respect to the questions asked, it is held executive privilege was improperly invoked and therefore not available to the Commission.

■ Plaintiffs have argued that executive privilege was waived during taking of Hubler's deposition by the Commission counsel's practice of employing the privilege in a "one-way" fashion, i. e., allowing the witness to divulge the contents of his advisory communications to others but not allowing the witness to relate the responses received by the witness. The Commission has countered by arguing that little damage to the public interest occurs when a government employee is permitted to reveal the substance of his (or her) communications, as long as the employee is prevented from divulging the communications of

54. See note 52, _supra._

55. The plaintiffs have a significant burden with respect to demonstrating the requisite showing of need sufficient to overcome any properly raised claim of executive privilege. It appears possible to describe the material sought by plaintiffs as falling within three classes of documents. First, some of the documents sought appear to be part of the administrative record and as such will, of course, be made available to plaintiffs. Other documents do not appear to have been considered by the Commissioners and thus cannot be part of the administrative record. Since review in this case is confined to the record, it is difficult to understand how

plaintiff could ever demonstrate any level of need for such items because, at the very least, documents belonging to this class would then fall outside the proper scope of discovery under Fed.R.Civ.Proc. 26(b). Finally a third category of documents may exist. This category consists of materials which were not directly considered by the Commissioners, but which may have been indirectly relied upon by the Commissioners in promulgating the LB Program. If such materials exist, plaintiffs may have an argument that they should be made available either as part of the administrative record or through discovery. See note 39, _supra._

others. This view of executive privilege is unacceptable. The purpose of this privilege is to promote frank and honest discussion within government agencies during the formulation of policy. If the privilege only attached to what one *hears* from others, as opposed to what one *says* to others, the privilege would be rendered meaningless since the purpose behind the rule would have evaporated. Moreover, given the Commission's view of the privilege in this context, one could always discover the total content of various intra-agency communications simply by deposing every participant to a particular conversation and obtaining information as to what that individual communicated to others. Therefore, if executive privilege had been properly invoked, the Commission would be deemed to have waived the privilege with respect to two specific questions [56] by allowing the witness to respond to prior questions in which the substance of the witness' advisory communications were divulged.

■ Neither the Commission's failure to properly demonstrate the existence of executive privilege nor its inadvertent waiver of the privilege with respect to two specific questions requires the Court to compel answers by Mr. Hubler. This is because Mr. Hubler's views have no relevance to the ultimate review to be undertaken by the Court in this action, as such review, with limited exceptions, will be confined solely to the administrative record.[57]

### III. *Attorney-Client Privilege*

■ The Commission has also sought to raise the attorney-client privilege with respect to two of the documents sought by plaintiff. The contours of this privilege in this district were recently enunciated in *International Paper Company v. Fibreboard Corporation, supra* where it was held that:

"'The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a *fact* of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for purposes of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.'"

63 F.R.D. at 93, *citing U. S. v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–9 (D.Mass.1950). While the Commission did submit an affidavit setting forth the facts upon which the attorney-client privilege claim is based, two elements necessary to justify the imposition of the privilege appear to be lacking. First, there is no showing that the documents contain any *facts* which had previously been communicated to Commission counsel. Secondly, the apparently wide distribution of these documents within the Commission renders it difficult to conclude that the original information conveyed, if any, was communicated in a confidential manner. Accordingly, the attorney-client privilege will not shield Documents Nos. 167 and 168.

### IV. *The Commission's Motion for a Protective Order*

■ The Commission's motion for a protective order is granted predicated

---

56. Questions Nos. 5 and 6, Docket No. 54, Exhibit D.

57. The Commission earlier sought a protective order against the taking of Mr. Hubler's deposition. Other than an improperly raised claim by counsel of executive privilege, the Commission's sole argument in support of its motion was that such discovery was improper because this was an enforcement proceeding. No contention was properly urged that such discovery was improper because lacking in relevance to the scope of review.

upon a finding that "good cause" has been demonstrated to prevent the taking of depositions from certain Commission officials.  While the Court has rejected both the Commission's argument that the taking of these depositions would disrupt the LB Program's functioning and the contention that the depositions are inappropriate because this is an enforcement proceeding, the Commission has correctly asserted that no purpose is served by continuing the depositions of Commission officials.  This is because the scope of review in this matter, confined with only limited exceptions, to the administrative record, renders such discovery improper and irrelevant.  *See Elm Grove Savings & Loan Ass'n v. Federal Home Loan Bank Board,* 391 F. Supp. 1041, 1043 (E.D.Wis.1975).  It is therefore unnecessary to deal with the Commission's request that the Court certify this question under 28 U.S.C. § 1292(b).[58]

---

**58.**  28 U.S.C. § 1292(b) provides that:

"(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.  The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order.  . . ."