SPRAGUE ELECTRIC COMPANY

v.

UNITED STATES (Capar Components Corp., Party-In-Interest).

C.R.D. 78–18; Court No. 77–9–03056.

United States Customs Court.

Dec. 27, 1978.

Stewart & Ikenson, Washington, D. C. (Eugene L. Stewart and Frederick L. Ikenson, Washington, D. C., of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C. (Joseph I. Liebman and William F. Atkin, Trial Attys., New York City), for defendant.

NEWMAN, Judge:

Defendant has again filed a motion for a protective order in this case respecting certain documents in the files of the International Trade Commission (ITC) sought by plaintiff, and in this connection defendant has now interposed a claim of executive privilege. That evidentiary privilege, which has been frequently encountered by the federal courts in various disputes arising out of discovery, has taken on a paramount significance in this Court in light of the expansion of our jurisdiction to review determinations of the Secretary of the Treasury and the ITC by the Trade Act of 1974 (Public Law No. 93–618, 88 Stat. 2052 (1975)).

## I.

Defendant's motion is presented in the following context: This is an American manufacturer's action brought by plaintiff pursuant to 28 U.S.C. § 1582(b) (1970), 28 U.S.C. § 2632(a) (Supp. V 1975) and 19 U.S.C. § 1516(c) (Supp. V 1975) contesting the negative injury determination of ITC in Investigation AA 1921–159 under the Antidumping Act of 1921, as amended (19 U.S.C. § 160, et seq. (1970 & Supp. V 1975)). 41 FR 47604–07 (1976).[1] That investigation

---

1. The jurisdictional uncertainty surrounding this action at the time issue was joined has been recently resolved in *SCM Corporation v. United States (Brother International Corporation, Party-in-Interest)*, 80 Cust.Ct. 226, C.R.D. 78–2 (1978), wherein Chief Judge Re held that the Customs Court has jurisdiction to review a negative injury determination by the Commission in an American manufacturer's action pursuant to 19 U.S.C. § 1516(c). See also my recent opinion in *Armstrong Bros. Tool Co., et al. v. United States (Great Neck Saw Manufacturing, Incorporated, Party-in-Interest)*, 80 Cust.Ct. 160, C.D. 4751 (1978), *modified on*

involved tantalum electrolytic fixed capacitors exported from Japan. Heretofore, in the course of discovery, plaintiff served upon defendant a second set of interrogatories and a second request for production of "All documents and things in the files of the International Trade Commission and/or individual Commissioners, pertaining to the Commission Investigation No. AA1921–159, involving *Tantalum Electrolytic Fixed Capacitors from Japan*", which investigation was the basis for the Commission's negative injury determination challenged in this action. Defendant thereupon moved for a protective order seeking to be relieved from responding to plaintiff's second set of interrogatories and second request for production grounded upon its theory of the scope and standard of review applicable to ITC injury determinations. By its prior motion, defendant sought to prohibit plaintiff from conducting discovery into matters beyond the Commission's notice of investigation and hearing (41 FR 33337–38 (1976)), the Commission's negative injury determination and its statement of reasons (41 FR 47604–07 (1976)).

On June 27, 1978, I entered an order denying defendant's prior motion for a protective order and requiring that Kenneth R. Mason, Secretary of the ITC, prepare and transmit to Joseph E. Lombardi, Clerk of the United States Customs Court, on or before July 28, 1978, the following: (1) a certified copy of the transcript of proceedings and exhibits introduced before the Commission in Investigation AA1921–159; (2) certified copies of all written submissions, questionnaires, reports and all other documents relating to Investigation AA1921–159; and (3) all other things in the files of the Commission relating to the investigation. The order of June 27, 1978

further provided that denial of defendant's then motion for a protective order was without prejudice to renewal respecting any documents or things that were received by the Commission on a confidential basis or are otherwise privileged. The predicate of my prior order was "to enable the court to determine whether or not the Commission's finding of injury was, among other things, arbitrary, an abuse of discretion, or otherwise contrary to law". *Sprague Electric Company v. United States (Capar Components Corp., Party-in-Interest)*, 80 Cust.Ct. 256, 257, C.R.D. 78–7 (1978).

In conformance with the order of June 27, 1978 and a "Stipulation for Protective Order" approved on July 31, 1978, numerous "public" and "confidential" documents have been transmitted by the Secretary of the Commission to the Clerk of this Court. Defendant, however, now seeks to relieve the Secretary of the ITC from transmitting to the Court, pursuant to the order, seven documents and a portion of one other document based upon a claim of executive privilege as formally asserted in an affidavit (with an annexed exhibit A) by Joseph O. Parker, Chairman of the ITC. These disputed documents are encompassed within the order of June 27, 1978, and thus defendant seeks a modification of that order. Alternatively, defendant seeks leave to proceed by way of an immediate appeal to the Court of Customs and Patent Appeals under 28 U.S.C. § 1541(b) (1976)[2] in the event that its present motion for a protective order is not granted.

## II.

As noted above, defendant's present motion rests upon executive privilege formally asserted in an affidavit executed by Chair-

---

*rehearing*, 81 Cust.Ct. ——, C.R.D. 78–14 (1978), following the rationale of *SCM*.

**2.** 28 U.S.C. § 1541(b) provides:

When the chief judge of the Customs Court issues an order under the provisions of section 256(b) of this title; or when any judge in the Customs Court, in issuing any other interlocutory order, includes in the order a statement that a controlling question of law

is involved as to which there is substantial ground for difference of opinion and that an immediate appeal from its order may materially advance the ultimate termination of the litigation, the Court of Customs and Patent Appeals may, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order * * *.

man Parker.[3] Plaintiff contends that the claim of privilege has not been properly invoked by defendant because the Chairman of ITC is not the "head" of the Commission, and consequently cannot speak for that body as a whole. Hence, we first address the issue of whether the Chairman of the ITC can properly claim executive privilege on behalf of the Commission.

[1] In *Smith v. F.T.C.*, 403 F.Supp. 1000 (D.Del.1975), an analogous issue was raised by plaintiffs as to whether the Chairman of the Federal Trade Commission is the "head" of that Commission for purposes of asserting executive privilege claims. In holding for the Commission, the Court articulated the following rationale (403 F.Supp. at 1016, n. 48):

> Plaintiffs have challenged whether the Chairman of the FTC is the "head" of the Commission for purposes of asserting executive privilege claims with arguments that the Chairman is not able to act on behalf of the Commission as a whole. The Court finds this argument to be unpersuasive because neoliteral compliance with the requirement that an agency head act in this context is unnecessary. That requirement was designed to deter governmental units from too freely claiming a privilege that is not to be lightly invoked, *U. S. v. Reynolds, supra* [345 U.S. 1, 7–8, 73 S.Ct. 528, 97 L.Ed. 727 (1953)], by assuring that someone in a position of high authority could examine the materials involved from a vantage point involving both expertise and an overview-type perspective. It is impossible to suggest that allowing the FTC Chairman to raise these claims will undermine the purposes behind this requirement.

Here, it must be recognized that Chairman Parker is the chief administrative officer of the ITC.[4] Paraphrasing the *Smith* holding, Chairman Parker is "someone in a position of high authority [who] could examine the materials involved from a vantage point involving both expertise and an overview-type perspective". Plainly, then, the rationale adopted by the Court in *Smith* concerning the Chairman of the FTC is fully applicable here to the Chairman of the ITC. Within the doctrine of *United States v. Reynolds*, 345 U.S. 1, 7–8, 73 S.Ct. 528, 97 L.Ed. 727 (1953), the Chairman of the ITC is clearly the "head" of the Commission for purposes of asserting a claim of executive privilege, and such claim was properly made by him in this case on behalf of the Commission. *See also Kerr v. United States District Court*, 511 F.2d 192, 198 (9th Cir. 1975) (by implication), *aff'd*, 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976).

### III.

Having determined that the claim of executive privilege was properly asserted by the Chairman of the ITC, we turn to the question of whether defendant's claim is applicable under the circumstances in this case. True it is that a governmental agency cannot bend the law to its will. And furthermore, there is no question that the judiciary has the power to review the decision of an agency or department head to withhold production of documents under a claim of privilege, and to determine whether such claim should be upheld or overruled. *United States v. Nixon*, 418 U.S. 683, 705, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 149 U.S.App.D.C. 385, 463 F.2d 788, 793 (1971); *Machin v. Zuckert*, 114 U.S.App.D.C. 335, 340, 316 F.2d 336, 341 (1963), *cert. denied*, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963); *Sun Oil Co. v. United States*, 514 F.2d 1020, 1023 (Ct.Cl. 1975); *Kaiser Aluminum & Chemical Corp. v. United States*, 157 F.Supp. 939, 947, 141 Ct.Cl. 38 (1958); *Kinoy v. Mitchell*, 67 F.R.D. 1, 7 (S.D.N.Y.1975); *O'Keefe v. Boeing Co.*, 38 F.R.D. 329, 334 (S.D.N.Y.1965).

---

3. "A close reading of cases where claims of executive privilege were raised indicates that the necessary facts have generally been required to be raised by affidavit". *Smith v. F.T.C.*, 403 F.Supp. 1000, 1016 (D.Del.1975).

4. See 19 U.S.C. § 1331(a) (1976), as amended by Pub.L. 95–106, 91 Stat. 868 (1977).

In support of a formal claim of executive privilege, there must be "a specific designation and description of the documents" claimed to be privileged. *Black v. Sheraton Corp. of America*, 371 F.Supp. 97, 101 (D.D. C.1974). Such designation and description "is necessary in order that a court be able to make a knowledgeable decision as to whether any document or portion thereof actually contains advisory or deliberative materials". *Smith v. F.T.C.*, 403 F.Supp. at 1016. In our case, exhibit A attached to Chairman Parker's affidavit specifically designates and describes each of the eight documents embraced by defendant's claim of executive privilege as follows:

Document               Description

a. An undated three-page "pros and cons" statement prepared by the Commission's staff for the use of Commissioners in arriving at the Commission's injury determination with regard to tantalum capacitors from Japan. This statement sets forth suggested criteria to be used as well as possible reasons for and against an affirmative injury determination. The document contains staff advice and alternative views and recommendations as to injury or likelihood of injury to the domestic industry.

b. An undated 6-page draft opinion entitled "Statement of Reasons for a Determination of No Injury or Likelihood Thereof" prepared by the Commission's staff for the consideration of, and use by, the Commissioners in arriving at their statements of reasons, with hand-written modifications made by, or at the direction, of individual Commissioners. The document contains staff advice, conclusions, deliberations, opinions, and recommendations as well as tangible evidence of Commissioners' thought processes (in the case of the hand-written modifications).

c. An undated 5-page draft opinion entitled "Statement of Reasons for Negative Determinations of Commissioners Will E. Leonard, Daniel Minchew, George M. Moore, Catherine Bedell, and Italo H. Ablondi" prepared by the Commission's staff for the consideration of, and use by, Commissioners in arriving at their statements of reasons. The document contains staff advice, conclusions, deliberations, opinions, and recommendations.

d. An undated 7-page draft opinion entitled "Statement of Reasons for Negative Determination of Chairman Will E. Leonard, Vice Chairman Daniel Minchew, and Commissioners George M. Moore, Catherine Bedell, and Italo Ablondi" prepared by the Commission's staff for the consideration of, and use by, the Commissioners in arriving at their statements of reasons, with hand-written modifications made by, or at the direction, of individual Commissioners. The document contains staff advice, conclusions, deliberations, opinions, and recommendations as well as tangible evidence of Commissioners' thought processes (in the case of the hand-written modifications).

e. An undated 8-page draft opinion entitled "Statement of Reasons for Affirmative Determination of Commissioner Joseph O. Parker" prepared by Commissioner Parker and his legal assistant for the exclusive consideration of, and use by, Commissioner Parker in arriving at his statement of reasons, with hand-written modifications made by, or at the direction of, Commissioner Parker. The document contains advice, conclusions, deliberations, opinions, and recommendations as well as tangible evidence of a Commissioner's thought processes (in the case of the hand-written modifications).

f. A one-page internal memorandum, dated October 5, 1976, from John Byrne of the Accounting Division to Harold Graves of the Metals Division setting forth arguments for and against an affirmative injury determination.

g. A two-page undated hand-written original of the typed memorandum referred to in f.

h. A one-page internal memorandum, dated June 13, 1977, from N.A. Lynch, Director of Industries, to R. A. Cornell, Deputy Director, Office of Operations, concerning erroneous import statistics. Privilege is invoked only as to that portion of the second paragraph of the memorandum which contains advice, characterization, and opinion regarding import statistics and their use.

Paragraphs 5 through 8 of Chairman Parker's affidavit recite the reasons for the claim of executive privilege, as follows:

5. All of the documents listed in Exhibit A consist wholly of internal communications which were prepared by members of the Commission's staff solely for their own use and/or the use of Commissioners or other staff members, and which were never circulated or disclosed to outsiders. These documents set forth and reflect advisory opinions, conclusions, considerations, deliberations, and recommendations, and comprise part of the process by which the Commission's decisions are formulated and its official duties and responsibilities are discharged. The opinions and recommendations expressed in the documents may not reflect the ultimate views or position of the Commission or of individual Commissioners.

6. I believe free and frank discussion within the Commission to be an essential part of the decision-making process. To be effective, however, confidential communications, recommendations, views, and advisory opinions, such as are contained in the documents listed in Exhibit A, must remain immune from public disclosure.

7. In my judgment, the effective functioning of the Commission requires that the confidentiality of the advice, characterization and opinion in the second paragraph of document h and of the whole of document a through g be pre-served. If these documents were disclosed, I believe the Commission's staff would be less candid in offering advice in the future, with resultant harm to the policy of open and frank discussion heretofore followed within the Commission. As a result, crucial decisions might be made with insufficient knowledge or inadequate advice. Additionally, disclosure of the hand-written modifications in documents b, d and e would amount to an inappropriate probing of the methods by which individual Commissioners arrive at their decisions.

8. Since disclosure of the documents specified in Exhibit A would impair the free flow of advisory opinions, arguments, conclusions, considerations, deliberations, and recommendations within the Commission and thus adversely affect the public interest, I, as Chairman of the Commission, respectfully assert a formal claim of privilege as to those documents.

## IV.

The thrust of defendant's position is that the above-described documents comprise (wholly or partly) intra-governmental advice, opinions, and recommendations for which an evidentiary privilege exists "so as to preserve the confidentiality of certain advice and/or evidence of the mental processes of Government personnel, including the Commissioners of the United States International Trade Commission, proferred [*sic*] during the course of the administrative proceedings in this case". Defendant's memorandum, at 2.

It is well established by a long line of decisions that the executive branch is privileged to withhold disclosure of intra-governmental documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions are formulated. *EPA v. Mink*, 410 U.S. 73, 86–87, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973); *Securities and Exchange Commission v. National Student Marketing Corp.*, 179 U.S.App.D.C. 56, 538 F.2d 404 (1976); *United States v. Berrigan*, 482 F.2d 171, 181 (3d Cir. 1973); *Smith v.*

*F.T.C.*, 403 F.Supp. at 1014, *et seq.; Committee for Nuclear Responsibility v. Seaborg*, 149 U.S.App.D.C. at 389, 463 F.2d at 792; *Boeing Airplane Co. v. Coggeshall*, 108 U.S.App.D.C. 106, 280 F.2d 654, 660 (1960); *Kaiser Aluminum & Chemical Corp. v. United States, supra; Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318 (D.D.C.1966), aff'd sub nom. *V.E.B. Carl Zeiss, Jena v. Clark*, 128 U.S.App.D.C. 10, 384 F.2d 979 (1967), *cert. denied*, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967); *Union Oil Co. of California v. Morton*, 56 F.R.D. 643 (C.D.Cal.1972); *Verrazzano Trading Corp. v. United States*, 70 Cust.Ct. 347, 350, C.R.D. 73–9 (1973). *Cf.* 5 U.S.C. § 552(b)(5) (1976); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975).

The basis for the executive privilege asserted here by defendant was succinctly stated in *Smith v. F.T.C., supra*, at 1015:

   * * * The purpose behind the executive privilege against disclosure of intraagency advisory communications is the encouragement of frank discussion within the government as regards the formulation of policy. *U. S. v. Berrigan*, 482 F.2d 171, 181 (3d Cir. 1973). This is because "human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decision-making process." *U. S. v. Nixon*, 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974). *Accord, Ackerly v. Ley*, 137 U.S.App.D.C. 133, 420 F.2d 1336, 1341 (1969) ("there are enough incentives as it is for playing it safe and listing with the wind"). *See also, NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975).

An additional policy reason for preserving the confidentiality of intra-governmental opinions and deliberations is expressed in *Zeiss, supra*, at 325–26:

   As important as are these considerations, the cases, analyzed critically, demonstrate that the immunity of intra-governmental opinions and deliberations also rests upon another policy of equal vitality and scope. *The judiciary, the courts declare, is not authorized "to probe the mental processes"* of an executive or administrative officer. This salutary rule forecloses investigation into the methods by which a decision is reached, the matters considered, the contributing influences, or the role played by the work of others—results demanded by exigencies of the most imperative character. No judge could tolerate an inquisition into the elements comprising his decision—indeed, "[s]uch an examination of a judge would be destructive of judicial responsibility"—and by the same token "the integrity of the administrative process must be equally respected." Identically potent reasons dictate that protection no less extensive be afforded the processes by which the Attorney General's responsibilities for decisional and policy formulations, legal or otherwise, are discharged. [Emphasis supplied.]

Continuing, the Court stated (page 326):

   Inextricably intertwined, both in purpose and objective, are these two principles. The rule immunizing intra-governmental advice safeguards free expression by eliminating the possibility of outside examination as an inhibiting factor, but expressions assisting the reaching of a decision are part of the decision-making process. Similarly, the so-called "mental process rule" impresses the stamp of secrecy more directly upon the decision than upon the advice, but it extends to all phases of the decision-making process, of which the advice is a part. Each rule complements the other, and in combination they operate to preserve the integrity of the deliberative process itself. It is evident that to demand pre-decision data is at once to probe and imperil that process. [Footnotes omitted.]

Moreover, the genesis of executive privilege is based upon "the constitutional principle of separation of powers". *United States v. Berrigan*, 482 F.2d at 181; *Black v. Sheraton Corp. of America*, 371 F.Supp. at 100 (D.D.C.1974).

As we have seen, the Chairman of the ITC has formally asserted executive privilege with respect to specifically identified documents prepared by the Commission's staff that comprised part of the decision-making process. In *KFC National Management Corp. v. National Labor Relations Board*, 497 F.2d 298, 304–05 (2d Cir. 1974), the Second Circuit—reviewing an unfair labor practice decision of the NLRB (which decision is "quasi-judicial" in nature, unlike an ITC injury determination)—cogently alluded to the "work product of such decision-making processes" as follows:

> Thus what emerges from the *Morgan* [5] quartet is the principle that those legally responsible for a decision must in fact make it, *but that their method of doing so—their thought processes, their reliance on their staffs—is largely beyond judicial scrutiny.*
>
> This court and many others have consistently relied on *Morgan* to uphold the use of hearing examiners in developing evidence and forming preliminary decisions, the reliance on staff assistants for recommendations and draft opinions, and a variety of other procedures designed to apprise those legally responsible for administrative decisions with the critical issues and evidence in a case and to record their individual determinations. *Concomitantly, the courts have consistently refused to issue subpoenas for the work product of such decision-making processes: Staff memos, expert reports, preliminary drafts, the oral testimony of the decision makers as to the basis for their opinions—all have been held to be beyond the purview of the contesting parties and the reviewing courts.* [Footnotes omitted. Emphasis supplied.]

The draft opinions and "pros and cons" statements sought by plaintiff (documents "a" through "g" in exhibit A) [6] comprise essentially intra-agency advisory opinions and recommendations by the Commission's staff, and were an integral part of the Commission's deliberative process. Thus, these opinions and statements fit squarely within the concept of executive privilege as enunciated in the above-cited cases.[7] In the process of making injury determinations and other decisions within the scope of its authority, it is undoubtedly in the public interest that the Commission and its staff must necessarily feel free to explore various alternatives on a confidential basis. As pointed up in *Kaiser Aluminum,* · 157 F.Supp. at 945–46:

> * * * Free and open comments on the advantages and disadvantages of a proposed course of governmental management would be adversely affected if the civil servant or executive assistant were compelled by publicity to bear the blame for errors or bad judgment properly chargeable to the responsible individual with power to decide and act. Government from its nature has necessarily been granted a certain freedom from control beyond that given the citizen. It is true that it now submits itself to suit but it must retain privileges for the good of all.
>
> There is a public policy involved in this claim of privilege for this advisory opinion—the policy of open, frank discussion between subordinate and chief concerning administrative action.

In sum, it is not the function of this Court "to probe the mental processes" of the ITC or its individual commissioners in reaching the negative injury determination challenged by plaintiff in this action. *Cf. United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941).

## V.

The ruling on defendant's motion respecting documents "a" through "g" would be apparent on the basis of what has been discussed thus far, but for one significant circumstance. The doctrine of executive

---

5. *See United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) (*Morgan* IV).

6. Documents "f" and "g", setting forth arguments "for and against" an affirmative injury determination, are treated the same as the "pros and cons" statement, document "a".

7. Document "h" will be considered *infra*.

privilege is not absolute, but is qualified. *Smith v. F.T.C.*, 403 F.Supp. at 1015; *Black v. Sheraton Corp. of America*, 371 F.Supp. at 100; *Kaiser Aluminum & Chemical Corp. v. United States*, 157 F.Supp. at 946. As stressed by the Court in *Black* (at 100):

> * * * Recognition of the claim [of executive privilege] requires *a delicate balancing of competing interests* : the public's interest in preserving confidentiality to promote open communication necessary for an orderly functioning of the government, and the individual's need for disclosure of particular information. *The question at the core of any claim of executive privilege is whether the damage resulting from disclosure outweighs the need for a just resolution of a legal dispute.* [Emphasis supplied.]

Again, in *Smith v. F.T.C., supra,* the Court enunciated the concept of "balancing" as follows (403 F.Supp. at 1015):

> * * * While the exact showing necessary to surmount a governmental claim of privilege is unclear [footnote omitted], what is basically involved in each case is an *ad hoc* balancing of individual need for the materials against the harm resulting from any such disclosure. * * *

*See also: Nixon, supra; Sun Oil Co., supra; Union Oil Co., supra; Committee for Nuclear Responsibility, supra.*

We now consider the fundamental question of whether plaintiff has demonstrated a need for the disputed documents which outweighs the harm that disclosure may do to intra-governmental candor. A "delicate balancing of competing interests", of course, cannot be accomplished so as to achieve a result having the invariance of a precise mathematical equation.

Filtered to its essentials, the first need advanced by plaintiff for production of the documents involved herein is to obtain the facts. Executive privilege, of course, does not apply to purely factual data prepared for intra- or inter-office use which would not compromise military or state secrets. *EPA v. Mink,* 410 U.S. at 87–88, 93 S.Ct. 827; *Verrazzano Trading Corp. v. United States,* 70 Cust.Ct. at 350–52. Even factual material included in deliberative memoranda has generally been held discoverable if susceptible to severance from its context. *See Smith v. F.T.C.,* 403 F.Supp. at 1015, and cases cited.

But nothing appearing in plaintiff's memorandum is persuasive that disclosure of the draft opinions and "pros and cons" statements is essential for obtaining the facts. It is emphasized that 130 "public" and 107 "confidential" documents have already been transmitted to the Court by the Commission pursuant to the order of June 27, 1978 and the "Stipulation for Protective Order" approved on July 31, 1978.[8] The within motion for a protective order covers but seven documents, and a portion of one other,[9] which are claimed by defendant to comprise advisory opinions and recommendations falling within the purview of executive privilege. Significantly, plaintiff's memorandum is devoid of any showing that the documents already furnished or otherwise accessible have not supplied the factual data which plaintiff requires.

*Zeiss* involved a somewhat analogous situation. There, the Court found that the parties seeking to subpoena certain documents from the files of the Department of Justice, for which a claim of executive privilege was asserted by the Attorney General, had failed to demonstrate need for production overbalancing the interests protected by the privilege. It appears there that the Government had produced approximately 4,500 documents and claimed executive privilege as to 49 others. In essence, the Attorney General's affidavit recited (a) that

---

**8.** The motion papers do not state the precise number of these "public" and "confidential" documents. An examination by the Court reveals that these figures are indicated on the lists transmitted by the Secretary of the ITC.

These documents fill two large cartons, and several are quite bulky and extensive in nature.

**9.** Defendant asserts that only a portion of the second paragraph of document "h" is privileged.

the documents withheld comprised intra-departmental memoranda and inter-departmental communications containing opinions, recommendations and deliberations pertaining to decisions the Department was required to make; and (b) the Attorney General's conclusion, following personal examination, that their production would be contrary to the public interest.

In sustaining the Government's claim of executive privilege, the Court expressed this rationale (40 F.R.D. at 327–28):

> Approximately 4,500 documents have already been furnished the claimants; those which have not been total only 49. While the issue at bar is not to be resolved by numbers alone, the sharp contrast between the data that have been produced and those that have not is quite revealing. The claimants have had access to all of the Government's communications with outsiders, as well as to nearly all intra-governmental materials, and the items withheld are all internal papers. Thus there could remain no unseen document primarily attesting the Government's relations with third persons. *More importantly, what are retained are intra-departmental memoranda and inter-departmental communications composed wholly of opinions, recommendations and deliberations relating to legal and other determinations. There is an obvious distinction, in terms of necessity for inspection, between documents of this character and those which contain facts.*
>
> While examination of the contested papers is not to be denied simply because they are secondary rather than primary sources, the size and diversification of the production already made raises great doubt as to what additional informational tendencies they could have. * * *
>
> *The claimants' presentation is also devoid of a showing that the papers already furnished have not supplied the great bulk of the information for which the claimants earlier professed a need.* Nothing appears that would make illogical the assumption that, the number and diversification of these documents considered, fresh non-governmental sources of information were indicated by exploration of which, through deposition or otherwise, additional information could be developed. There is nothing beyond sheer speculation to even hint that the information the retained communications drew upon as the basis for the opinions and recommendations expressed does not appear or is not discoverable from the mass of data the claimants now possess. *Necessity for production is sharply reduced where an available alternative for obtaining the desired evidence has not been explored.* [Emphasis supplied. Footnotes omitted.]

In *Kaiser Aluminum*, plaintiff brought an action against the Government for breach of a most favored purchaser clause in a contract for the sale of war plants to plaintiff. Plaintiff moved for production of a document containing an advisory opinion on intra-office policy concerning the sales of the plants, and a claim of executive privilege from discovery was asserted by the General Services Administration. In sustaining the Government's claim of privilege, the Court of Claims stated as the linchpin of its decision (157 F.Supp. at 946–47):

> * * * The document sought here was a part of the administrative reasoning process that reached the conclusion embodied in the contracts with Kaiser and Reynolds. *The objective facts, such as the cost, condition, efficiency, terms and suitability are otherwise available.* So far as disclosure of confidential intra-agency advisory opinions is concerned, we conclude that they belong to that class of governmental documents that are privileged from inspection as against public interest but not absolutely. It is necessary therefore to consider the circumstances around the demand for this document in order to determine whether or not its production is injurious to the consultative functions of government that the privilege of non-disclosure protects.
>
> We have spoken of the broad coverage of the plaintiff's request. While this is not the attorney-client privilege, the demand for this document seeks to lay bare

the discussion and methods of reasoning of public officials. The fact that the author is dead is immaterial here. It is not a privilege to protect the official but one to protect free discussion of prospective operations and policy. This goes beyond the disclosure of primary facts upon which conclusions are based. It is akin to the request for "production of written statements and mental impressions contained in the files and the mind of the attorney," which are unprotected by the attorney-client privilege. Cf. *Hickman v. Taylor, supra,* 329 U.S. [495] at page 509, 67 S.Ct. [385] at page 392 [91 L.Ed. 451]. *Nothing is alleged by Kaiser, through the affidavit of its negotiating Vice President, Mr. Calhoun, or otherwise, to suggest any need for production of the document to establish facts.* [Emphasis supplied.]

Under the totality of the circumstances in this case, I do not find an "overbalancing" need by plaintiff for the draft opinions and "pros and cons" statements to establish the facts.

## VI.

Plaintiff further contends that because of the voluminous administrative record in this case, the draft opinions and "pros and cons" statements may help to focus on the facts and documents thought (by the Government) to be most significant. It is apparent from this flawed contention that plaintiff seeks the draft opinions and "pros and cons" statements as indicia of the elements or considerations which entered into the Commission's deliberative process. Use of the draft opinions and "pros and cons" statements for that purpose "would clearly violate the established rule * * * forbidding investigation into the processes by which decisions and policies are formulated". *Zeiss,* 40 F.R.D. at 329. And *Cf. Rosee v. Board of Trade,* 36 F.R.D. 684, 689 (N.D.Ill.1965), wherein the Court stated: "[T]he cerebrations and mental processes of

government officials, leading to admittedly proper exercises of power, can never be a factor in a judicial proceeding and, therefore, need not be disclosed".[10]

■ The nub of the matter is, that after applying the "delicate balancing" concept, plaintiff's showing of need for the draft opinions and "pros and cons" statements does not "overcome" the Commission's substantial showing of need for confidentiality embraced within the principle of qualified privilege afforded advisory opinions and recommendations.

## VII.

We now turn to plaintiff's suggestion that the disputed documents be transmitted to the Court for an *in camera* inspection.

## A.

Where discovery is resisted, as in the instant case, courts frequently examine documents *in camera* in order to determine whether they should be held in a confidential status or be disclosed to the party seeking production. *See United States v. Nixon,* 418 U.S. at 714–16, 94 S.Ct. 3090; *EPA v. Mink,* 410 U.S. at 88, 93 S.Ct. 827 and cases cited; *Pasco Terminals, Inc. v. United States,* 80 Cust.Ct. 249, C.R.D. 78–3 (1978); *Verrazzano Trading Corp. v. United States,* 69 Cust.Ct. 307, 314, C.R.D. 72–19, 349 F.Supp. 1401 (1972); *Sun Oil Co. v. United States,* 514 F.2d at 1024–25. Confidentiality is not diminished by *in camera* inspection. *Nixon,* 418 U.S. at 706, 94 S.Ct. 3090. However, *in camera* inspection is not to be utilized in every case as a matter of course. In this connection, the Supreme Court definitely admonished, in *EPA,* 410 U.S. at 92–94, 93 S.Ct. at 838:

* * * As was said in *Kaiser Aluminum & Chemical Corp.,* 157 F.Supp. at 947, 141 Ct.Cl. at 50: "It seems . . . obvious that the very purpose of the privilege, the encouragement of open expression of opinion as to governmental policy

**10.** *Rosee* was cited on another point by the Supreme Court in *EPA v. Mink,* 410 U.S. 73, 88, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).

is somewhat impaired by a requirement to submit the evidence even *[in camera]*." Plainly, in some situations, *in camera* inspection will be necessary and appropriate. But it need not be automatic. An agency should be given the opportunity, by means of detailed affidavits or oral testimony, to establish to the satisfaction of the District Court that the documents sought fall clearly beyond the range of material that would be available to a private party in litigation with the agency. The burden is, of course, on the agency resisting disclosure, 5 U.S.C. § 552(a)(3), and if it fails to meet its burden without *in camera* inspection, the District Court may order such inspection. But the agency may demonstrate, by surrounding circumstances, that particular documents are purely advisory and contain no separable, factual information. A representative document of those sought may be selected for *in camera* inspection. And, of course, the agency may itself disclose the factual portions of the contested documents and attempt to show, again by circumstances, that the excised portions constitute the barebones of protected matter. In short, *in camera* inspection of all documents is not a necessary or inevitable tool in every case. Others are available. Cf. *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). In the present case, the petitioners proceeded on the theory that all of the nine documents were exempt from disclosure in their entirety under Exemption 5 by virtue of their use in the decision-making process. On remand, petitioners are entitled to attempt to demonstrate the propriety of withholding any documents, or portions thereof, by means short of submitting them for *in camera* inspection.

Thus, in *Kaiser Aluminum* (cited with approval by the Supreme Court in *EPA, supra* ) the Court of Claims refused to make an *in camera* inspection of a document containing an intra-agency advisory opinion because of plaintiff's failure to make a definite showing of necessity; and in this connection the Court commented (157 F.Supp. at 947–48):

* * * To require it [examination of the privileged document] here would mean the creation of an absolute right for judicial examination and determination of all evidence whose discovery the executive deemed contrary to the public interest. If executive determination is to be merely preliminary, the officer and agency most aware of the needs of government and most cognizant with the circumstances surrounding the legal claim will have to yield determination to another officer less well equipped. Circumstances may require such a course. This should not be ordered without definite showing by plaintiff of facts indicating reasonable cause for requiring such a submission.

The *Zeiss* court similarly declined to make an *in camera* inspection, and defined the circumstances under which such inspection would be appropriate (40 F.R.D. at 331–32):

*In camera* inspection in executive privilege cases is appropriate where it appears with reasonable clarity that the party seeking production is entitled to access to some of the materials demanded. Examination in this type of situation enables the separation of what should be disclosed from what should not be revealed. Again, it may be that the balance between competing needs for confidentiality and disclosure cannot be made without analysis of the disputed data. Here the inspection enables the weighing to be done in the privacy of the judge's chambers. In each situation, however, a need, actual or potential, for production adequately appears, and the examination affords the means for fulfilling that need.

That no such occasion is presented in this case is amply demonstrated, without plowing old ground, by brief reference to previous discussion. *The claimants have not shown that they are or could be entitled to the documents the Government still retains. The Government, on the other hand, has made a substantial showing that everything that is withheld falls well within the scope and protection of*

*the privilege, and it satisfactorily appears that the balance on disclosure or secrecy is decidedly in its favor.* · It is clear, too, that the claimants' projected investigation into the Government's decisional and deliberative processes is legally impermissible, and the circumstances rather plainly suggest that they have alternatives they might utilize to obtain that to which they may be entitled. Here inspection can satisfy no need for separation, for there appears nothing to separate; nor any need for balancing, with apparently nothing here to be weighed. [Footnotes omitted. Emphasis supplied.]

*See also: Committee for Nuclear Responsibility, Inc. v. Seaborg, supra; Walled Lake Door Co. v. United States,* 31 F.R.D. 258 (E.D.Mich.1962).

### B.

As previously noted, the Chairman of the Commission has submitted an affidavit describing the content of the documents claimed to be privileged. Plaintiff, however, insists that the Court should not rely exclusively upon the Chairman's characterization of the documents, but should conduct an *in camera* inspection. In connection with utilizing *in camera* inspection to verify the accuracy of an affidavit claiming executive privilege, the Court observed in *Zeiss,* at 332:

> The claimants, however, contend for an *in camera* inspection for purposes of verifying that the content of the documents withheld is what the Government says it is. But to require examination here for that reason alone would mean not only an utter disregard for the affidavit of an executive with Cabinet status, but also "the, creation of an absolute right for judicial examination and determination of all evidence whose discovery the executive deemed contrary to the public interest." The necessity the moving party must show is considerably more than a demand that someone other than his adversary look at the materials in question to make certain that statements as to their character are accurate. [Footnotes omitted.]

Hence, following the foregoing reasoning, I find no necessity in the present case for examining *in camera* documents "a" through "g" for the purpose of verifying the accuracy of the descriptions set forth in exhibit A of the affidavit submitted by defendant.

### C.

■ However, a different situation is presented in document "h", described in exhibit A of Chairman Parker's affidavit as a "memorandum * * * concerning erroneous import statistics", for which the Chairman invokes a claim of executive privilege "only as to that portion of the second paragraph of the memorandum which contains advice, characterization, and opinion regarding import statistics and their use". Exhibit A of the Parker affidavit.

In *Zeiss,* the Court noted (40 F.R.D. at 332, n. 61) that in certain cases where the courts utilized the *in camera* inspection procedure for determining claims of executive privilege, "it appeared, before the inspection was ordered, that the claimant was entitled to some amount of discovery", and it was necessary to separate the privileged and unprivileged materials. Here, plaintiff concededly is entitled to a severable, but undelineated, portion of the second paragraph of document "h". It is, obviously, for the Court and not the Chairman of the ITC to decide what portion of the second paragraph is or is not privileged. *Cf. Machin v. Zuckert,* 114 U.S.App.D.C. at 340, 316 F.2d at 341. Consequently, I shall make an *in camera* inspection of document "h" before reaching and determining the claim of privilege as to that document. Indeed, there can be no doubt of the propriety of such *in camera* inspection. *Kerr v. United States District Court,* 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976); *United States v. Nixon,* 418 U.S. at 706, 94 S.Ct. 3090; *Sun Oil Co. v. United States,* 514 F.2d at 1024; *Committee for Nuclear Responsibility, Inc. v. Seaborg,* 149 U.S.App.D.C. at 389, 391, 463 F.2d at 792, 794; *Boeing Airplane Co. v. Coggeshall,* 108 U.S.App.D.C. at 114, 280

F.2d at 662; *Smith v. F.T.C.*, 403 F.Supp. at 1018; *O'Keefe v. Boeing Co.*, 38 F.R.D. at 336; *United States v. Certain Parcels of Land*, 15 F.R.D. 224, 231 (S.D.Cal.1954).

After careful consideration of defendant's present motion for a protective order and its alternative request for permission to appeal, and its memorandum and affidavit in support thereof, plaintiff's memorandum in opposition thereto, and all other papers and proceedings had herein, it is hereby ORDERED:

1. That defendant's motion for a protective order is granted with respect to documents "a" through "g" described in exhibit A annexed to the affidavit of the Chairman of the ITC.

2. That the Secretary of the ITC is relieved from the requirement to transmit to the Clerk of the Court documents "a" through "g" described in exhibit A annexed to the affidavit of the Chairman of the ITC.

3. That within thirty (30) days of the entry of this order, the Secretary of the ITC shall prepare and transmit under seal to Joseph E. Lombardi, Clerk of the United States Customs Court, two certified copies of document "h" described in said exhibit A, for which a claim of executive privilege has been made by the Chairman of the ITC respecting a portion of the second paragraph of the document. One certified copy shall be in complete and unexpurgated form; the second copy shall have excised therefrom the portion of the second paragraph which defendant claims comprises privileged matter.

4. That document "h" shall be inspected by the Court *in camera* for the purpose of considering defendant's claim of executive privilege, and determining whether the excised portion of the second paragraph of the document comprises privileged matter which should not be disclosed to plaintiff.

5. That this Court's order of June 27, 1978 is modified in accordance with the foregoing paragraphs.

6. Defendant's alternative request to file an immediate appeal from this order pursuant to 28 U.S.C. § 1541(b) is denied.